NATHAN A. WHITFIELD, trustee in bankruptcy for E. C. &
J. B. Kern, Incorporated, complainant-respondent,

*v.*

EDWARD C. KERN, JOHN B. KERN and FANNIE R. KERN,
defendants-appellants.

[Argued October 29th, 1936.   Decided April 30th, 1937.]

334

*Mr. Abraham M. Herman,* for the appellants.

*Mr. Jacob Lipman* (*Mr. George H. Rosenstein,* of counsel), for the respondent.

The opinion of the court was delivered by

HEHER, J.

Appellants, Edward C. Kern and John B. Kern, were severally adjudged guilty of "misappropriations" of the moneys of E. C. & J. B. Kern, Incorporated, now a bankrupt corporation, prior to the adjudication in bankruptcy; and they and Fannie R. Kern, who constituted the board of

directors of the corporation during the period of the claimed peculations, were found to have been guilty of "gross negligence" in the directorial management of the corporate affairs and business, and personal liability for the moneys so "misappropriated" was decreed. The decree differentiates the respective liabilities, based upon what was conceived to be "the greater and lesser degrees of culpability." As between themselves, John B. was held primarily liable for the entire amount necessary to liquidate the claims of creditors at the time of the adjudication, plus the administrative expenses and costs of this suit. A secondary liability was imposed upon Edward C., with "recourse over against John B. Kern as to any payment made" by him, while Fannie R. was adjudged "thirdly liable," with "recourse over against John B. Kern and Edward C. Kern and either of them, as to any payments made" by her.

The corporation was organized on February 26th, 1920, and was adjudged bankrupt on May 31st, 1932. It was engaged in the combined optical and retail jewelry business. It was a "family corporation"—"close corporation," in the popular rather than the technical sense, is a term more definitely descriptive. The business had been founded by Edward C. some thirty-one years prior to the incorporation, and it concededly was in a prosperous state at the latter time. Fannie R. is his wife. John B. is his son. The original capital fund was $16,400, divided into one hundred and sixty-four shares of the par value of $100 each. Edward C. held the majority of the issued stock, while his wife and son owned the remainder. Within two years after the incorporation, the earned surplus was used to increase the capital fund to $24,600. Thus these surplus moneys, like the original subscriptions to the capital stock, were dedicated to capital. These stockholders constituted the corporate body's board of directors from the time of its organization until the adjudication in bankruptcy; and they all took an active part in the conduct of the business until February 23d, 1927, when Edward C., because of ill health, sold and assigned all his stock, then two hundred and twenty-four shares, to John B.,

and assumed a mere advisory role in relation to corporate management. From then until the adjudication, John B. held all but two of the outstanding shares of the capital stock. His father and mother had one share each to qualify them for membership in the board of directors.

The business continued to prosper. There is evidence to show that its surplus increased from $1,330.90, at the close of the year 1926, to $7,113.92 at the end of the year 1929; and that its net worth increased during the same period from $25,990.90 to $31,713.92. In 1930 the annual net profit was reduced to $557.18, while a loss was suffered in the year 1931. The claims proved in bankruptcy totaled $20,747.92. The additional moneys needed to satisfy these claims, with interest, after the liquidation of the estate, amounted to approximately $21,000; and this sum the appellants were decreed to pay to the trustee. The decline in fortune was attributed by appellants to the current trade depression.

The withdrawals of corporate funds at issue are classable under three heads, viz.:

(1) $3,000 paid to Edward C. in the year 1928, and a like amount paid to him in the year 1929. It was claimed that these disbursements were made as compensation for services rendered to the corporation by Edward C., but the learned vice-chancellor found that, while there was some evidence of services "in an advisory capacity" furnished by him during those years, the sums in question were received as payments on the principal of a mortgage given to secure the purchase price of the corporate stock sold by him to John B. in 1927;

(2) $8,000 drawn by John B. as compensation for services rendered to the corporation in excess of what the vice-chancellor found was the reasonable value of the services, i. e., $5,200 per year. The total annual withdrawals were as follows: $5,733.69 in 1927, $9,670.52 in 1928, $6,755.89 in 1929, $6,047.92 in 1930 and $5,698.66 in 1931. John B. possessed the technical skill and training requisite for the proper conduct of the business, and he devoted his entire time to it. At the time of the purchase of his father's stock,

he was a graduate ophthalmologist, and also a graduate optometrist, admitted to practice in this state. He had been trained in the business under the tutelage of his father. His general management included the examination of eyes, the grinding and fitting of lenses, the repair of jewelry, the selling of goods, and the keeping of books; and—

(3) $19,000 claimed to have been taken in various amounts by John B., who was the corporate treasurer, during the period commencing in January, 1931, and ending with the date of the adjudication in bankruptcy. There is no contention that these sums represent withdrawals of profits. John B. maintains that they were not appropriated to his own use, but "were either in exchange or most likely were notes that were discounted or renewed," and points in demonstration of this to what he terms "unexplained" deposits corresponding respectively in date and amount to the sums withdrawn.

In respect of classes (1) and (2), there was plainly no embezzlement nor misappropriation of corporate funds by an officer or director without claim of right thereto. Bad faith is not charged. The evidence tends to show that the moneys so taken represent withdrawals by the owner of all but two of the outstanding shares of capital stock, either as profits or as compensation for services rendered. Although the bill alleged the making of these disbursements and the conduct of the business while the corporation was insolvent, there was no finding of insolvency at the times of these respective withdrawals; and the decree does not proceed upon the theory that the rights of creditors occupying that status at the time of the adjudication in bankruptcy were thereby impaired. As a matter of fact, their claims arose subsequent to the withdrawals, with the possible exception of some of the salary payments made in the latter part of the year 1931. The *ratio decidendi* of the decree under review is that they were rendered illegal because not sanctioned by corporate action, or ratified thereafter, and that the directors are also liable in the premises as for "gross negligence," in "failing to exercise supervision and control

over the acts of the said John B. Kern and Edward C. Kern, and over the business, affairs and transactions of the said E. C. & J. B. Kern, Incorporated." Conceding that these payments could have been authorized or ratified, if thereby the capital fund was not impaired, the lack of appropriate corporate action is held to be fatal; and the loss thus occasioned is the sole basis of the liability fastened upon the directors.

A trustee in bankruptcy is the representative of the corporation, and of the creditors as well, where there has been infringement of the latter's rights as a class, as distinguished from a direct, tortious, individual injury. His is a comprehensive title.

The bankruptcy act, in terms, invests the trustee, by operation of law, with the title of the bankrupt and his rights and remedies as of the date of the adjudication in bankruptcy. *11 U. S. C. A. § 110.* But this and cognate sections have been interpreted as evincing a purpose to vest in the trustee the title to such property "as it was at the time of the filing of the petition." *Isaacs* v. *Hobbs Tie and Timber Co., 282 U. S. 734; 51 S. Ct. 270; 75 L. Ed. 645; Everett* v. *Judson, 228 U. S. 474; 33 S. Ct. 568; 57 L. Ed. 927; 46 L. R. A. (N. S.) 154; Acme Harvester Co.* v. *Beekman Lumber Co., 222 U. S. 300; 32 S. Ct. 96; 56 L. Ed. 208.*

And he is possessed also of certain special rights and remedies conferred upon creditors by the state law and by this and related sections of the bankruptcy act, designed to secure the preservation of the insolvent estate as a fund for the benefit of all the creditors. He is vested with title to property transferred by the bankrupt in fraud of his creditors, and property which, prior to the filing of the petition, he could by any means have transferred or which might have been levied upon and sold under judicial process against him. *11 U. S. C. A. § 110 (a), subdivs. (4), (5).* He may avoid any transfer of property by the bankrupt which any of his creditors might have avoided, and recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a *bona fide* holder for value prior to the date of the adjudication. *11 U. S. C. A. § 110 (e).*

Section 47 (a), subdivision (2), of the Bankruptcy act endows the trustee with all the rights, remedies and powers of a creditor "armed with process." *11 U. S. C. A.* § *75.* The rights thus conferred are primary and not derivative. By this section the trustee is vested, as the representative of the creditors, with all rights conferred upon them by the state law. *In re Horton, 31 Fed. Rep. (2d) 795; Remington on Bankruptcy* § *1547.* See, also, sections 60 and 67 (a), (b), (c), (e) and (f) of the statute, relating to the trustee's authority, in the right of creditors, to avoid, for fraud, want of valid record, ·or for other reasons, the bankrupt's transfer of property, notwithstanding his own incapacity in the premises. *11 U. S. C. A.* §§ *96, 107.*

It is a corollary of the foregoing that, except as qualified by the special provisions of the Bankruptcy act adverted to, the trustee bears the same relation to creditors that the bankrupt sustained to them prior to the inception of the proceedings. An estoppel binding upon the corporation and the stockholders is likewise effective against the trustee, unless the rights of creditors thus secured by the Bankruptcy act or by state law have been infringed. In the absence of fraud, the trustee takes the bankrupt's estate subject to all valid claims, liens and equities, except as modified by the positive provisions of the Bankruptcy act. *Thompson* v. *Fairbanks, 196 U. S. 516; 25 S. Ct. 306; 49 L. Ed. 577; Zartman* v. *First National Bank of Waterloo, 216 U. S. 134; 30 S. Ct. 368; 54 L. Ed. 418; York Manufacturing Co.* v. *Cassell, 201 U. S. 344; 26 S. Ct. 481; 50 L. Ed. 782; W. F. Pigg & Son, Inc.,* v. *United States, 81 Fed. Rep. (2d) 334; Colorado National Bank* v. *Newton, Trustee, 80 Fed. Rep. (2d) 696; Beacon Trust Co.* v. *Dolan, 27 Fed. Rep. (2d) 247.*

The essential question therefore is whether, by the withdrawals comprised in the first two classes, the rights of the corporation, its stockholders, or creditors, were invaded. This necessarily involves consideration of the nature and extent of the stewardship of such corporate officers. At common law, and by the modern current of authority in this country and in England, the directors of a private corporation, while

not regarded as trustees in the strict, technical sense (for title to the corporate property is in the corporation itself and not in its directors), are considered in equity as bearing a fiduciary relation to the corporation and its stockholders. The relationship has a two-fold aspect, viz.: Agency in the ordinary sense, and a trusteeship in relation to the corporate moneys and property, if not, indeed, the exercise of corporate powers generally. They are *quasi*-trustees for the stockholders. At least until insolvency occurs, the latter alone comprise the *cestuis que trust*. Until then the directors bear the same relation to its creditors as the agent of an individual holds to his creditors. The latter have rights against the corporation, but no special rights against the directors as such, except such as may be created by statute or may arise from tortious conduct imposing direct liability upon the directors.

There is a contrariety of view as to whether, upon insolvency, the same relationship arises also as to creditors. *Webb v. Cash, 35 Wyo. 398; 250 Pac. Rep. 1; Daniels v. Berry, 148 S. C. 446; 146 S. E. Rep. 420; Killen v. Barnes, 106 Wis. 546; 82 N. W. Rep. 536; Bosworth v. Allen, 168 N. Y. 157; 61 N. E. Rep. 163; Frost Manufacturing Co. v. Foster, 76 Iowa 535; 41 N. W. Rep. 212; Young v. Haviland, 215 Mass. 120; 102 N. E. Rep. 338; Hart v. Evanson, 14 N. D. 570; 105 N. W. Rep. 942; 3 L. R. A. (N. S.) 438; Thomas v. Matthews, 94 Ohio St. 32; 113 N. E. Rep. 669; City National Bank v. Goshen Woolen Mills Co., 35 Ind. A. 562; 69 N. E. Rep. 206.* The English cases reject the theory of a trusteeship as to creditors, even during insolvency. It was unknown to the common law. *Charitable Corp. v. Sutton (1742), 2 Atk. 400; York and North-Midland Railway Co. v. Hudson (1853), 16 Beav. 485; Ferguson v. Wilson (1866), 2 Ch. 77; Great Eastern Railways Co. v. Turner (1872), 8 Ch. 149; In re Forest of Dean, &c., Co. (1879), 10 C. D. 450; In re Lands Allotment Co. (1894), 1 Ch. 616; Re Wincham Shipbuilding and Boiler Co. (Poole, Jackson and Whyte's Case), 48 L. J. Ch. 48; (1878) 9 Ch. D. 322; 38 L. R. 659; 26 W. R. 823.*

However, the modern view seems to lean toward the American doctrine of a fiduciary relation as to creditors during insolvency. *In re Barry and Staines Linoleum, Ltd., 103 L. J. Ch. 113; (1934) 1 Ch. 227; 150 L. T. 254.*

Our court of equity long since adopted the rule that upon the insolvency of the ordinary private corporation, a *quasi*-trust relationship arises between its directors and creditors; and, so far as the reported cases indicate, it seems not to have been directly challenged. *Landis* v. *Sea Isle City Hotel Co., 31 Atl. Rep. 755;* affirmed in part, *53 N. J. Eq. 654; Bird* v. *Magowan, 43 Atl. Rep. 278; Montgomery* v. *Phillips, 53 N. J. Eq. 203; Savage* v. *Miller, 56 N. J. Eq. 432; Mills* v. *Hendershot, 70 N. J. Eq. 258; Shoenthal* v. *New Jersey Gardens Co., 103 Atl. Rep. 415.* As a perusal of the cited cases will disclose, this doctrine has been severely criticised in other jurisdictions as unsound in principle. But in this state the rule in a qualified form has a statutory basis. Present provisions of our General Corporation act make evident this policy.

By section 30 of that statute, the corporate directors are enjoined to declare dividends only from the corporation's surplus or net profits arising from its business, and to preserve its "capital stock" against reduction, except in the manner therein authorized, on pain of liability (whether the violation be willful or negligent) for the dividends so paid, "to the full amount of any loss sustained by [its] stockholders;" and, in case of insolvency, they are liable "to the corporation or its receiver to the full amount of any loss sustained by the corporation, by reason of such withdrawal, division or reduction." *2 Comp. Stat. 1910 p. 1617.* Section 47 authorizes the directors, "after reserving over and above its capital stock paid in, as a working capital for said corporation, such sum, if any, as shall have been fixed by the stockholders," to declare a dividend "of the whole of its accumulated profits exceeding the amount so reserved." *2 Comp. Stat. 1910 p. 1629.* Section 48 prescribes that "nothing but money shall be considered as payment of any part of the capital stock of any corporation organized" under the act, and that

no loan of money shall be made to a stockholder or officer thereof, provided that (section 49) stock may be issued for property purchased "to the amount of the value thereof." *2 Comp. Stat. 1910 p. 1630.*

This court has held that, under these sections, the "capital stock paid in or subscribed" constitutes a "trust fund" for the payment of the corporation's debts, and that the directors, as the trustees thereof, "cannot dispose of it to the prejudice of creditors without an equivalent consideration, nor defeat the trust by accepting any simulated payment of a stock subscription, or by any other device short of actual payment in good faith." *Easton National Bank* v. *American Brick and Tile Co., 70 N. J. Eq. 732.* The genius of these and kindred provisions of the statute is that the creditors, having contracted with the corporation in reliance upon the existence of the capital stock as a "trust fund" for their benefit, may resort to it for payment. As was said by Mr. Justice Pitney in the last cited case, the statutory scheme "requires stock subscriptions to be made good for the benefit of creditors of insolvent companies, without distinction between prior and subsequent creditors, or between creditors who had notice and those who had none." See, also, *Siegman* v. *Electric Vehicle Co., 72 N. J. Eq. 403; Appleton* v. *American Malting Co., 65 N. J. Eq. 375; Mills* v. *Hendershot, supra; Whittaker* v. *Amwell National Bank, 52 N. J. Eq. 400; Wetherbee* v. *Baker, 35 N. J. Eq. 501.*

The statute does not, however, create a trust in the strict, technical sense. This "trust fund" doctrine, wholly statutory in origin, is subject to the limitation that a solvent corporation, like a solvent individual, holds its property free from any enforceable trust or equitable lien in favor of its creditors. See *Hollins* v. *Brierfield Coal and Iron Co., 150 U. S. 371, 383, 385; 14 S. Ct. 127; 37 L. Ed. 1113; McDonald* v. *Williams, 174 U. S. 397; 19 S. Ct. 743; 43 L. Ed. 1022; Ratcliff* v. *Clendenin, 232 Fed. Rep. 61.* The directors of such a corporation are in no sense trustees of the creditors in the transaction of the ordinary business of their principal, and, except as thus laid down in the statute, are

no more accountable to the creditors for mismanagement of the corporate affairs than the agent of an individual would be to his principal's creditors.

Thus the corporate body is bereft of the power to impair its capital stock by the payment of dividends or to resort to other means of reduction not sanctioned by the statute. And its directors are likewise charged with the duty of maintaining the integrity of this capital, on the faith of which credit was extended, as a trust fund for the security of the creditors, as well as for the benefit of the corporation; and, by the same token, the corporation has an action against the directors for a breach of this trust, tested by the accepted standard of duty, if thereby this capital fund has suffered impairment or reduction. And this without regard to whether the credit was extended thereafter. The unanimous action of the stockholders is not operative to destroy this protection accorded to creditors. It is not within their province to frustrate the statutory scheme set up for the benefit of third persons or grounded in public policy. This is a salutary legislative policy. It safeguards the corporate financial structure, and secures to the creditors the fund pledged for the liquidation of their claims in lieu of the personal liability of the corporators. Those who invoke the corporate formula to escape individual liability are enjoined thus to safeguard the interests of those who extend credit to the body.

And, by like reasoning, this fiduciary relation continues during insolvency in respect of the assets representing the corporation's capital stock. This, too, is a modification, springing from the statute, of the rule that, in the absence of disabling statutory provisions, an insolvent corporation possesses the same dominion and control over its assets as an insolvent natural person. *Wilkinson* v. *Bauerle, 41 N. J. Eq. 635; Gallagher* v. *Asphalt Company of America, 65 N. J. Eq. 258.* Compare *Price* v. *United States, 269 U. S. 492; 46 S. Ct. 180; 70 L. Ed. 373; Cross* v. *Beguelin, 252 N. Y. 262; 169 N. E. Rep. 378.* The test of insolvency in this state is the general inability of the corporate debtor to meet its pecuniary liabilities as they mature, by means of

either available assets or an honest use of credit. *Hersh* v. *Levinson Bros., Inc., 117 N. J. Eq. 131.* While it is conceivable that, under certain circumstances, there may be insolvency even though the aggregate of the corporate property, at a fair valuation, is in amount adequate for the payment of its debts, it is to be borne in mind that such insufficiency of assets is ordinarily an accompaniment of financial incapacity, so measured. *E converso*, there may be solvency in the statutory sense, notwithstanding the assets, so valued, are less in amount than the liabilities.

Managerial misconduct and negligence, while primarily wrongs to the corporation, are remediable on behalf of creditors as well as the corporate entity, if the former's rights have been invaded. Generally, creditors in bankruptcy cannot complain of mismanagement occurring before their obligations came into being. *Fletcher Cyc. Corp. (Perm. Ed.)* § *1196.* Ordinarily, no equity arises in their favor in such circumstances. But, by force of the statute, this doctrine is not applicable if an impairment of the capital thereby results. And, in the enforcement of the rights thus arising, the trustee represents the injured creditors. See *Mills* v. *Hendershot, supra; National Trust Co.* v. *Miller, 33 N. J. Eq. 155, 158.* And he may bring suit in the common law right of a corporation to hold its officers accountable for a breach of their fiduciary duty to it. *Manning* v. *Campbell, 264 Mass. 386; 162 N. E. Rep. 770.*

Tested by these principles, the withdrawals ranged in classes (1) and (2) are not tainted with invalidity entitling the trustee in bankruptcy to their recovery for the benefit of creditors, unless their security has been impaired. We find no suggestion that they were made in contemplation of future insolvency, or with intent to hinder, delay or defraud creditors. Concededly, the interests of the nominal stockholders were not thereby prejudiced. John B. was possessed of the entire outstanding beneficial stock interest; and while this did not relieve the nominal stockholders serving as directors of the responsibility imposed by law and the contract upon such officers, they were at the time of the filing of the petition

in bankruptcy (assuming no injury to creditors), precluded, either in their own right or that of the corporation, from challenging the withdrawals as *de facto* or constructive dividends. To him, as the treasurer and executive head of the business and the beneficial holder of the capital stock, they committed the absolute directorial management of the business and the exercise of all corporate powers; and equity will not, in such circumstances, permit them or the corporation, as a distinct entity, to challenge the withdrawals so made because not surrounded with all formal requisites, if the rights of creditors were not thereby transgressed. They were made with the tacit assent of the inactive directors and stockholders. Acquiescence is to be implied from the long continued course of practice. They covered a period of five years or more, and appropriate book entries were made in the usual course. The principle of equitable estoppel is applicable. John B., by this course of conduct, gained rights on the faith of the consent thus given which equity will not permit to be set at naught.

In the eye of the law, the corporation is an entity separate and distinct from its constituent members, and is not obligated by the individual acts of the latter. The law regards the corporate body as an artificial person. But equity, to borrow the language of Mr. Justice Pitney, speaking for this court in a somewhat similar case, "realizes that this legal entity is but a legal fiction; looking through the form it discerns the substance. It finds that a stock corporation is in essence an aggregation of individuals, a statutory partnership with assignable membership and limited liability of the members, and so the doctrine of equitable estoppel applies fully to all the internal concerns of stock companies. Saving so far as public policy and the interests of creditors and other third parties are concerned * * , *, the stockholders may bind themselves *inter sese* and in favor of the corporation by their own acts and agreements, and what will bind all the stockholders, with respect to an obligation from the company to one of its members, will bind the company as such." *Breslin* v. *Fries-Breslin Co., 70 N. J. Law 274, 282.*

In fine, the conception of a legal entity distinct from the persons composing the corporation is to be disregarded, in equity, in cases not within the reason and policy of this legal fiction, *e. g.*, to adjust equities among members of the corporation internally where the rights of the public or third persons are in nowise involved. *14 C. J. 59, 60; Fletcher Cyc. Corp. (Perm. Ed.)* §§ *41 et seq.*

And so, an estoppel operating upon the stockholders binds the corporation, unless the rights of third parties are violated. This is the logical development of the equitable doctrine that the directors are trustees for the stockholders. See, also, *Lillard* v. *Oil, Paint and Drug Co., 70 N. J. Eq. 197; New Jersey Car Spring and Rubber Co.* v. *Fields, 85 N. J. Law 217.* And compare *Ratcliff* v. *Clendenin, supra: Chattanooga Sav. Bank* v. *Brewer, 9 Fed. Rep. (2d) 982, Kearneysville Creamery Co.* v. *American Creamery Co., 103 W. Va. 259; 137 S. E. Rep. 217; 51 A. L. R. 938; Central of Georgia Railway Co.* v. *Central Trust Company of New York, 135 Ga. 472; 69 S. E. Rep. 708; In re Wilson's Estate, 85 Ore. 604; 167 Pac. Rep. 580; Rorke* v. *Thomas, 56 N. Y. 559; Dodge* v. *Corporations and Taxation Commissioner, 273 Mass. 187; 174 N. E. Rep. 109; Freeman* v. *Rogers White Lime Co., 138 Ark. 312; 211 S. W. Rep. 146; Atwood* v. *Huff, 130 Va. 624; 108 S. E. Rep. 562.*

Equitable jurisdiction to review and revise salary drafts by corporate officers is grounded upon the existence of a fiduciary relation. *Lillard* v. *Oil, Paint and Drug Co., supra; Hayes, Receiver,* v. *Pierson, 65 N. J. Eq. 353; 45 Atl. Rep. 1091; United States Steel Corp.* v. *Hodge, 64 N. J. Eq. 807; Booth* v. *Beattie, 95 N. J. Eq. 776; Stratis* v. *Andreson, 254 Mass. 536; 150. N. E. Rep. 832; 44 A. L. R. 567.* If there are no dissenting stockholders, and the capital stock is not thereby affected, there is no basis for equitable intervention. Injury to the stockholders or creditors, or violation of an absolute right of the corporation itself, is a prerequisite. In the absence of such detriment, exorbitant withdrawals for services may be classified as dividends. *Hadley* v. *Internal Revenue Commissioner, 36 Fed. Rep. (2d) 543:*

*E. M. T. Coal Co.* v. *Rogers, 216 Ky. 440; 288 S. W. Rep. 342; Kearneysville Creamery Co.* v. *American Creamery Co., supra; Dodge* v. *Corporations and Taxation Commissioner, supra.*

Of course, these considerations are not applicable to the asserted withdrawals comprised in class (3). It is denied that these moneys were drawn from the treasury. In view of respondent's reliance upon exhibits not incorporated in the state of the case, and inasmuch as these conclusions lead to a rehearing, we deem it unnecessary to review the determination of this factual issue and the related questions raised. For present purposes, it suffices to point out that if the claimed abstractions were made, accountability is conceded, and that if the contrary be the case, it would seem that the capital stock as a trust fund for creditors had been largely depleted. If this condition was the result of the director's failure to observe the standard of duty in relation to corporate management thus laid upon them, they are answerable for the injurious consequences suffered by the creditors.

The decree is accordingly reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, BODINE, HETFIELD, JJ. 4.

*For reversal*—TRENCHARD, LLOYD, CASE, HEHER, PERSKIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, COLE, JJ. 10.