

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-4-2007

# VFB LLC v. Campbell Soup Co

Precedential or Non-Precedential: Precedential

Docket No. 05-4879

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"VFB LLC v. Campbell Soup Co" (2007). *2007 Decisions*. Paper 1173.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1173

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-4879

_____

VFB LLC, a Delaware limited liability company,
Appellant

v.

CAMPBELL SOUP COMPANY;
CAMPBELL INVESTMENT COMPANY;
CAMPBELL FOODSERVICE COMPANY;
CAMPBELL SALES COMPANY; CAMPBELL SOUP
COMPANY, LTD (Canada);
JOSEPH CAMPBELL COMPANY; CAMPBELL SOUP
SUPPLY COMPANY, L.L.C.;
PEPPERIDGE FARM, INCORPORATED

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 02-cv-00137)
District Judge: Hon. Kent Jordan

_____

Argued January 18, 2007

Before: SLOVITER, RENDELL, and CUDAHY,[*]
Circuit Judges

_____

[*] Hon. Richard D. Cudahy, United States Senior Circuit
Judge for the United States Court of Appeals for the Seventh
Circuit, sitting by designation.

(Filed: March 30, 2007)

_____

John A. Lee, Esquire
Robin Russel, Esquire
Andrews & Kurth LLP
600 Travis, Suite 4200
JP Morgan Chase Tower
Houston, TX 77002

Barbara W. Mather                **[ARGUED]**
Robert L. Hickok
Benjamin P. Cooper
Pepper Hamilton LLP
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103
        *Counsel for Appellant*

Richard P. McElroy
Mary Ann Mullaney
Blank Rome LLP
130 North 18th Street
One Logan Square
Philadelphia, PA 19103

Michael W. Schwartz            **[ARGUED]**
Harold S. Novikoff
David C. Bryan
Wachtell, Lipton, Rosen & Katz
51 West 52d Street
New York, NY 10019
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

CUDAHY, <u>Circuit Judge</u>.

2

In 1998, Campbell Soup Co. incorporated a wholly-owned subsidiary, Vlasic Foods International, Inc., and sold it several food companies in exchange for borrowed cash. Then it issued the subsidiary's stock to Campbell shareholders as an in-kind dividend, making VFI an independent company. Within three years of this transaction, VFI filed for bankruptcy and sold the food companies for less than it had paid for them. VFI has since reorganized into the bankruptcy creature VFB, LLC, and acting on behalf of VFI's disappointed creditors claims that the transaction was a constructively fraudulent transfer and that Campbell aided a breach of fiduciary duty by VFI's directors. The district court entered judgment for Campbell after a bench trial. VFB appeals both from the judgment and from the district court's decision to strike a motion to amend the judgment. We affirm.

I. Background

In 1996, Campbell Soup Co. (Campbell) decided to improve its stock price by disposing of certain underperforming subsidiaries and product lines, the largest and most prominent of the lot being Vlasic, of pickle fame, and Swanson, the TV dinner manufacturer. (The companies in question were eventually organized into what Campbell called its "Specialty Foods Division"; we will refer to the companies by that name or as "the Division.") The Division companies were not highly regarded within Campbell. One consultant urged that all the relevant businesses other than Vlasic and Swanson had basically no growth potential and should be managed strictly for cash. (Op. at 13.) Vlasic and Swanson were both troubled, but they were historically strong brands that, it was thought, might be turned around under new management. (Op. at 14-15.)

Campbell decided the best way to dispose of the Division would be through a "leveraged spin" transaction. Campbell would incorporate a new wholly-owned subsidiary and the subsidiary would take on bank debt in order to purchase the

3

Division.[1]  Then Campbell would give the stock in the subsidiary to Campbell shareholders as an in-kind dividend.  Campbell would remove underperforming businesses from its balance sheet and get cash; Campbell shareholders would own roughly the same assets as before, albeit in different corporate packages.[2]

The terms of the spin were negotiated between Campbell and a group of high-ranking Campbell employees who sought to manage the new subsidiary, named Vlasic Foods International, Inc. (VFI), after the spin.  Campbell declared several basic terms of the agreement non-negotiable, among them the businesses to be transferred to VFI and VFI's initial debt level (that is, how much it would pay Campbell for the Division).  The future VFI managers later testified that Campbell did not give them the resources they needed to properly research the transaction.  The resulting bargain contained various additional terms unfavorable to VFI.

The deal closed on March 30, 1998.  On VFI's end, the spin was approved by VFI's "pre-Spin directors," also major Campbell officers, who understood their sole task to be approving the spin and resigning.  They did not investigate the deal and made no effort to protect VFI's interests as against Campbell's.

The district court called the bargain struck in the spin "particularly hard" for VFI, but further concluded that it was even harder than the public knew at the time.  For two years before the spin, Campbell massaged the Specialty Foods Division's operating results, ostensibly misleading the public about its operating record and prospects.  The spin took place

---

[1]Technically, what happened in the present case was that the banks extended *Campbell* credit under a loan agreement that provided that the rights and obligations under the agreement would be assumed by the subsidiary upon transfer of the Division. (Op. at 27.)  This transaction is, for our purposes, functionally identical to the transaction described above.

[2]No one claims that the spin harmed Campbell shareholders.

4

midway through Campbell's 1998 fiscal year (FY1998); Division managers used a number of techniques in FY1997 and FY1998 to increase short term sales and earnings (and to secure salary bonuses tied to meeting operating targets). But none of the techniques changed the companies' longer-term prospects. For instance, VFB focuses on "product loading" as the chief tool used to prop up sales and earnings. This term refers to using bulk discounts and other promotional tools to encourage retailers to increase their inventory. While this technique increases sales in the short term, there is a corresponding decrease in sales in a later period as retailers allow their inventories to decline to normal levels. Product loading and similar tactics[3] in FY1997 and early FY1998 left VFI facing an imminent corrective decrease in its sales and earnings at the time of the spin.

VFB now urges (and Campbell does not argue the point) that because of these tactics, Campbell's SEC disclosures in the years leading up to the spin, and in particular the FY1997 and FY1998 earnings figures on the Form 10 SEC filing describing the spin transaction itself, were unreliable. (Op. at 16, 22-23.) The filings misled not only the public securities markets, but also the banks providing the leverage for the transaction, which did not independently investigate the performance of the Specialty Foods Division but instead "relied heavily on 'pro forma' financial statements and projections supplied by Campbell." (Op. at 27.)

After the spin, the Specialty Foods Division's inflated sales and earnings figures quickly corrected themselves. By June, VFI had lowered its FY1998 earnings estimates from $143 million to $70 million. VFI feared that this would soon lead to a default of its loan agreement with the banks, so it sought to renegotiate the agreement. The banks, after thoroughly examining VFI's finances, agreed to a new loan agreement on

---

[3] Among the other devices Campbell is said to have used are reducing inventory to create "last in first out" gains, delaying scheduled maintenance, using corporate reserves, changing its deduction assumptions and underestimating trade spending.

September 30, 1998.  Among other things, the agreement required VFI to reduce the banks' exposure by issuing new bonds contractually subordinated to the bank debt.

Despite these very public problems, VFI did not fold. The price of its shares on the New York Stock Exchange remained essentially steady.  Indeed, VFI outperformed the S&P mid-cap food index from the time of the spin, March 30, 1998, through January 1, 1999.  (Op. at 30.)  More than a year after the spin, in June 1999, VFI successfully completed its required issue of $200 million in unsecured debt to institutional investors, despite disclosing discouraging financial data for the first nine months of FY1999, declining sales, limited advertising and product innovation, and other worrisome news.  (Op. at 34-36.) VFI's market capitalization never dropped below $1.1 billion until January 1999.

While VFI did not suddenly collapse, it nonetheless slowly declined, presumably because of basic problems in its business (declining sales, for example, a problem shared by most food companies during the period in question). (Op. at 58.) VFI's managers had hoped to reinvigorate the Vlasic and Swanson brands with aggressive advertising and expansion campaigns, but they lacked the cash for such an ambitious project after renegotiating VFI's loan agreement with the banks. VFI needed all its available cash to service its debt.  (Op. at 40.)

In January 2000, VFI discovered that it had underestimated its accrued trade spending in FY1999 and earlier–that is, its salesmen had granted discounts to various bulk purchasers throughout FY1999, but although FY1999 ended in September 1999, VFI did not accurately calculate the effect of those discounts until January 2000. The discovery drove down VFI's FY2000 earnings, triggered a default under the new loan agreement and sent the public price of VFI's unsecured debt below par value. (Op. at 40-41.)  One year later, VFI filed for bankruptcy. (Op. at 42.)

VFI sold off the former Specialty Foods Division piecemeal both before and during bankruptcy, in a period from

6

roughly January 1999 to May 2001. These sales brought in $504 million, which discounts back to $385 million at the time of the spin, $115 million less than VFI paid for the Division at that time.

VFI assigned all of its legal claims against Campbell to the plaintiff VFB, LLC, a Delaware limited liability company whose members are VFI's impaired creditors. (The banks are not members; they have already been made whole because of security interests and other protection granted by the renegotiated loan agreement. VFB's members are the holders of the unsecured bonds issued in 1999, the landlord of VFI's headquarters and certain of VFI's employees and trade creditors.) VFB then brought the present action against Campbell, seeking to set aside the spin as a constructively fraudulent transfer and claiming that Campbell aided and abetted a breach of VFI's pre-spin directors' duty of loyalty to VFI.

The district court held a lengthy bench trial. The chief factual dispute concerned the value of the Specialty Foods Division on March 30, 1998, and specifically whether it was worth the $500 million VFI paid for it. The parties offered three chief types of evidence on this point. First, there was the price of VFI's publicly traded stock and bonds. The 45 million outstanding shares of VFI stock traded at $25.31 on the New York Stock Exchange at the close of trading on March 30, 1998. This put VFI's equity market capitalization at $1.1 billion, which, considering VFI's $500 million debt obligation, put the value of the Specialty Foods Division at $1.6 billion. VFB argued that the market price reflected the misleadingly high pre-spin earnings figures in Campbell's SEC reports rather than the true value of the Division, but the district court noted that VFI's market capitalization did not even drop below $1.1 billion until 1999, despite the market's quickly learning the truth about VFI's earnings prospects in 1998.

Second, the parties submitted various valuations of the Specialty Foods Division and VFI, prepared before and after the spin for use by Campbell and VFI. The estimated values of the Division businesses were uniformly above $500 million.

7

Third and finally, the parties hired economic expert witnesses and had them estimate the value of the Division. Campbell presented Timothy Leuhrman, who estimated VFI's post-spin value by comparing it to that of six other companies he considered comparable to VFI; he guessed that the Division businesses were worth $1.5-1.8 billion at the time of the spin. VFB called three experts. Henry Owsley, comparing VFI to a different set of companies and performing a discounted cash flow analysis, estimated the Division's worth at $569 million and $270-360 million, respectively. Sheridan Titman and Greg Hallman performed a discounted cash flow analysis that produced a value for the Division of $377 million.

The district court concluded that the Specialty Foods Division was worth well in excess of the $500 million VFI paid for it on March 30, 1998. It relied primarily on the price of VFI's stock, reasoning that as private traders seek to pay no more for an asset (and sell an asset for no less) than it is worth, the market price was a rational valuation of VFI in light of all the information available to market participants. Although the price was infected by Campbell's manipulation of the Division's earnings at the time of the spin, VFI's stock price remained high even after the truth about VFI's prospects had been fully exposed. The district court concluded that the post-exposure market capitalization was based on an accurate picture of VFI's position as of March 30, 1998, indicating a value of well over $500 million at that time.

The district court also addressed the expert witnesses' valuations in some detail, finding Leuhrman's analysis convincing and Owsley, Titman and Hallman's analyses flawed, primarily due to hindsight bias, that is, their use of assumptions about VFI that were not shared by the informed public markets at the time of and after the spin. (Op. at 62-68.) But basically the district court regarded the hired expert valuations as a sideshow to the disinterested evidence of VFI's capitalization in "one of the most efficient capital markets in the world."

> VFB does not even attempt to show any market valuation of VFI contemporaneous with the Spin-off that is

8

anywhere close to the figures urged by VFB's experts. There is simply no credible evidence to justify setting aside VFI's stock price and the other contemporaneous market evidence of VFI's worth. Even if, as VFB implies, the market was suffering from some "irrational exuberance" in establishing VFI's stock price, that gives me no basis for second-guessing the value that was fairly established in open and informed trading. (Op. at 58.)

In light of that conclusion, the court determined both that the spin was not a fraudulent transfer and that, because VFI had been solvent at the time of the spin, it owed no "fiduciary duty to future creditors of VFI."

In the district court, Campbell also brought certain bankruptcy claims against VFB (successor in interest to VFI). VFB asked the court to disallow the claims because Campbell did not offer any proof for them, but the court held that once Campbell had submitted a facially valid claim, the burden fell to VFB to offer some evidence to rebut it. VFB had offered no such evidence into the record, so the district court allowed the claim. VFB then moved to amend the judgment under Bankruptcy Rule 9023, which motion the district court struck as untimely.

II. Discussion

VFB appeals from the district court's judgment and the striking of its motion to amend the judgment. We review the district court's legal determinations *de novo, Jean Alexander Cosmetics, Inc. v. L'Oreal, USA, Inc.*, 458 F.3d 244, 248 (3d Cir. 2006), but its findings of fact "shall not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a); *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 209-10 (3d Cir. 2006).

A. Constructive Fraudulent Transfer

VFB seeks to set aside the spin as a fraudulent transfer. The parties do not dispute whether VFB, as VFI's successor, has the right to "avoid any transfer of an interest of [VFI] in property

9

or any obligation incurred by [VFI] that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable." 11 U.S.C. § 544(b)(1).

Both parties agree that New Jersey law applies. Under New Jersey's version of the Uniform Fraudulent Transfer Act:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. N.J. Stat. Ann. § 25:2-27(a).

Alternatively,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ithout receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.
> *Id.* § 25:2-25(b)

To succeed under either of these provisions, VFB must at least show that the Specialty Foods Division was not "reasonably equivalent value" for the $500 million provided to Campbell. The district court concluded that it was reasonably equivalent.

10

New Jersey law does not offer a universal definition of "reasonably equivalent value," *cf.* N.J. Stat. Ann. § 25:2-24(b) (addressing foreclosure sales), and neither does the case law, *see, e.g., Flood v. Caro Corp.*, 640 A.2d 306, 310 (N.J. Super. App. Div. 1994). This is probably as it should be, since reasonably equivalent value is not an esoteric concept: a party receives reasonably equivalent value for what it gives up if it gets "roughly the value it gave." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006); *Mellon Bank, N.A. v. Metro Comms., Inc.*, 945 F.2d 635, 647 (3d Cir. 1991). We think the New Jersey Supreme Court would agree with the "common sense" approach we have used to determine "reasonably equivalent value" under the bankruptcy code's similar fraudulent transfer provision, 11 U.S.C. § 548(a)(1)(B)(I). *Fruehauf Trailer*, 444 F.3d at 214; *see also Highlands Ins. Co. v. Hobbs Group, LLC*, 373 F.3d 347, 351 (3d Cir. 2004) ("[W]here the state's highest court has not spoken definitively on a particular issue, the federal court must make an informed prediction as to how the highest state court would decide the issue.").

Clearly the Division and VFI's cash were both valuable assets, but was the Division worth roughly the $500 million that VFI paid for it? In a meticulous and well-considered opinion the district court concluded that it was, reasoning primarily that in light of VFI's $1.1 billion market capitalization nine months after the spin, the Division businesses were worth indeed far more than $500 million. Because the court focused on VFI's market capitalization as evidence of its value, VFB now concentrates on attacking this approach.

Some portions of VFB's brief seem to argue that courts should never measure the value of a business by its market capitalization because the market price of a corporation's stock "is based on expectations (projections) of future income," which may turn out to be inaccurate. (Reply Br. for Appellant at 11.) That contention is clearly wrong. Equity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate; fraudulent transfer law cannot rationally be invoked to undermine that function. *In re R.M.L., Inc.*, 92 F.3d 139, 151 (3d Cir. 1996)

11

("Presumably the creditors . . . want a debtor to take *some* risks that could generate value."). True, earnings projections "must be tested by an objective standard anchored in [a] company's actual performance," but such a test applies to information about a company's performance available "when [the projection is] made." *Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992). Market capitalization is a classic example of such an anchored projection, as it reflects all the information that is publicly available about a company at the relevant time of valuation. *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) (plurality); *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986). A company's actual subsequent performance is something to consider when determining *ex post* the reasonableness of a valuation, *see Moody*, 971 F.2d at 1074, but it is not, by definition, the basis of a substitute benchmark, *R.M.L.*, 92 F.3d at 155 (criticizing "[t]he use of hindsight to evaluate a debtor's financial condition").

We therefore move on to VFB's chief argument, that the district court erred in holding that VFI's market capitalization measured the value of its assets because Campbell manipulated the Specialty Foods Division's sales and earnings prior to the spin.[4] The value of a business is a mixed question of fact and

[4]We find it difficult to understand how Campbell's sales and earnings manipulation could have seriously misled the public markets about the Division's prospects, especially its "product loading." Product loading involves highly public sales campaigns using devices like sweepstakes and coupons to encourage retailers to take on a larger inventory than usual. (*See, e.g.,* Op. at 17.) We suspect that it would be easy for interested observers to take the effect of this behavior into account when evaluating Campbell's reports and projections. We also find the banks' failure to independently investigate the Division to be somewhat unusual conduct for an institution lending half a billion dollars with a further quarter-billion credit line in reserve. But, in any event, the district court assumed, and took into account, some misleading of the public. (*See, e.g.,* Op. at 16, 22-23, 27.) Our difficulties are irrelevant to the result of this appeal.

law, with the underlying factual findings reviewed for clear error and the court's choice of legal precepts and application of those precepts to the facts reviewed *de novo*. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 209-10 (3d Cir. 2006); *R.M.L.*, 92 F.3d at 147; *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 641-42 (3d Cir. 1991).

VFB argues that whether VFI's market capitalization reflected its value is a purely legal question because it concerns the proper "method of valuation" of VFI's businesses, and should therefore be reviewed *de novo*, citing *Amerada Hess Corp. v. Commissioner of Internal Revenue*, 517 F.2d 75, 82 (3d Cir. 1975). VFB misreads *Amerada Hess*. We held in that case that the proper method of valuation in a *particular factual context* is a legal question. *Id.* (*citing Richardson v. Commr. of Internal Revenue*, 151 F.2d 102, 103 (2d Cir. 1945)); *see also Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1063 (3d Cir. 1992). But the factual context is, naturally enough, a question of fact, and it is the context that the parties dispute in the present case. All agree that if the market capitalization was inflated by Campbell's manipulations it was not good evidence of value; the question is whether it was so inflated. We review the court's resolution of that question for clear error. *See Moody*, 971 F.2d at 1063; *Amerada Hess*, 517 F.2d at 83.

Were the market capitalization numbers on which the district court relied inflated? VFB often attempts to confuse the nature of the district court's reasoning on this point, for instance by stating that the court relied on "VFI's market capitalization at the time of the Spin" despite finding that investors were at that time misled by Campbell's manipulation. (Br. of Appellant at 46-47.) That is not what the court did. It explicitly chose *not* to rely on VFI's market capitalization at the time of the spin, precisely because of Campbell's manipulation, and instead looked at market capitalization several months later, when the truth of VFI's situation had become clear. (Op. at 54-56.) Nobody contends that VFI was worth more in September 1998 than at the end of March 1998. Consequently, if VFI's September 1998 market capitalization reflected a value for the Division businesses of at least $500 million, despite no longer

13

being affected by Campbell's pre-spin operations, then the Division must have been worth more than $500 million at the time of the spin.

VFB's fraudulent conveyance claim therefore fails unless VFB can show that the district court clearly erred in concluding that the market price of VFI's stocks and bonds were no longer affected by Campbell's pre-spin manipulations as of September 1998, an issue that VFB seems reluctant to squarely address. Its only argument is to point out that in January 2000, during VFI's FY2000, VFI discovered a $15 million underestimation of FY1999 trade spending that, when figured into FY2000 earnings, triggered a default under VFI's new loan agreement and caused its unsecured debt to trade below par value. VFB urges that this demonstrates that VFI was in fact insolvent in FY1999, when the underestimated trade spending was actually occurring.

This argument shows that VFI was insolvent in FY2000; if the bondholders thought VFI solvent, they wouldn't have sold their debt so cheaply. This argument *might* also suggest that VFI was insolvent in FY1999, although that conclusion is speculative. Additional trade spending alone might not have been enough to render VFI unable to pay its debts; declining sales or some other worsening aspect of VFI's condition between FY1999 and FY2000 might have contributed.

But what the argument clearly does *not* show is that VFI was insolvent in FY1998, at the time of the spin. Even if the bondholders were unaware of the current state of VFI when trading bonds at par value in FY1999, they were still aware of everything Campbell reportedly concealed about the Specialty Foods Division prior to the spin. (VFB cites to testimony indicating that some of the underestimated trade spending may have occurred before FY1999 (App. at 1221), but it makes no effort to quantify how much, and both the evidence and the arguments suggest that the lion's share occurred in FY1999 (*see, e.g.,* App. at 1662).) Again, nobody claims that VFI's fortunes were improving, so the market's valuation of VFI as solvent in FY1999 was strong evidence that VFI was solvent at the time of

14

the spin, and therefore received reasonably equivalent value for its $500 million.

VFB makes additional arguments concerning its expert witnesses' valuations, urging that it was clear error to dismiss them in favor of the market figures, but we do not think that the district court erred in choosing to rely on the objective evidence from the public equity and debt markets. To the extent that the experts purport to measure actual post-spin performance, as by, for example, discounted cash flow analysis, they are measuring the wrong thing. To the extent they purport to reconstruct a reasonable valuation of the company in light of uncertain future performance, they are using inapt tools. *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 362 (3d Cir. 2002) (noting that discounted cash flow analyses are imprecise and have value only "in certain limited situations"). Absent some reason to distrust it, the market price is "a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses." *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996); *see also In re Hechinger Investment Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005); *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985) ("[T]he price of stock in a liquid market is presumptively the one to use in judicial proceedings.").

VFB has consequently not shown clear error in the district court's finding that the Specialty Foods Division was worth far more than its $500 million in debt acquired at the time of the spin. We stress that, given the arguments VFB has made, the question is not even close. Valuing an asset is a difficult task that depends upon detailed factual determinations, which may be overturned only if they are "completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors*, 323 F.3d 228, 232 (3d Cir. 2003)). Where the asset being valued is a speculative investment, a trial court's factual determinations will be "largely immune from attack on appeal." *In re R.M.L., Inc.*, 92 F.3d 139, 154 (3d Cir. 1996).

For its appeal to succeed, VFB must show that on March 30, 1998, the Specialty Foods Division was *clearly* worth less than $500 million. Yet it never engages with the relevant numbers in any detail, explaining by how much Campbell's various manipulation techniques affected its statistics, or by how much the statistical inflation affected VFI's market capitalization. Its approach is simply to note that Campbell played with its operations and suggest that the market capitalization numbers may have been wrong to some undetermined degree.

They may have been, but only to the extent that the market was in the dark about the Division's operational prospects. VFB's theory is that the potential for new management to turn around Vlasic's and Swanson's slow slide depended on ready access to sufficient capital to launch brand-expansion programs, and that in light of the early renegotiation of VFI's loan agreement Campbell never gave it a reasonable chance of having access to that capital, dooming it to eventual insolvency and bankruptcy. But the participants in the 1998 equity market were familiar with VFI's business plan, knew about the renegotiated loan agreement and the likely trouble VFI would have getting access to capital, and still nonetheless valued the company at well more than $500 million, apparently concluding that the company's chances of success were good. VFB's arguments may create some very meager doubt, but the district court's task is to resolve doubts by a preponderance of the evidence. VFB's arguments do not shake our belief that it performed this task meticulously and accurately; the district court carefully considered both the evolving facts and Campbell's duty not to constructively defraud VFI's present and future creditors.

Because the district court did not err in concluding that VFI received reasonably equivalent value in the spin, we need not discuss the fine distinctions between balance-sheet insolvency, equitable insolvency and unreasonable undercapitalization. Judgment against VFB on its fraudulent transfer claim must be affirmed.

16

B.  Aiding and Abetting a Breach of Corporate Fiduciary Duty

VFB's second claim against Campbell is that Campbell aided and abetted a breach of the VFI directors' duty of loyalty to VFI when it entered into the spin transaction knowing that the VFI directors were simultaneously serving as officers of Campbell.  New Jersey imposes civil liability for knowingly aiding and abetting an agent's breach of a duty of loyalty to its principal.  *Franklin Med. Assocs. v. Newark Public Schs.*, 828 A.2d 966, 974-76 (N.J. Super. Ct. App. Div. 2003); *Hirsch v. Schwartz*, 209 A.2d 635, 640 (N.J. Super. Ct. App. Div. 1965) (citing Restatement 2d of Agency § 312).  To hold Campbell liable, VFI must of course show, among other things, that the VFI directors did in fact breach a duty of loyalty to VFI. *Franklin Med. Assocs.* 828 A.2d at 975; *see also Gotham Partners, L.P. v. Hallwood Realty Partners, L..P.*, 817 A.2d 160, 172 (Del. 2002) (setting forth the elements of aiding and abetting a breach of fiduciary duty).  It is here that the district court rejected VFB's claim, holding that VFI's directors breached no fiduciary duty because VFI was solvent at the time of the spin.

Corporate directors must act in their shareholders' best interests and not enrich themselves at its expense. *Cede & Co v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified,* 636 A.2d 956 (Del. 1994); *AYR Composition, Inc. v. Rosenberg*, 619 A.2d 592, 595 (N.J. Super. App. Div. 1993).  The law enforces this duty of loyalty by subjecting certain actions to unusual scrutiny.  Where a director acts while under an incentive to disregard the corporation's interests, she must show her "utmost good faith and the most scrupulous inherent fairness of the bargain." *In re PSE & G Shareholder Litigation*, 801 A.2d 295, 307-308 (N.J. 2002) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)); *Brundage v. New Jersey Zinc Co.*, 226 A.2d 585, 598-99 (N.J. 1967).

VFB urges that VFI's pre-spin directors had an incentive to and admittedly did disregard VFI's best interests in the context of the spin because they were simultaneously officers of Campbell.  Normally, simultaneously serving two transacting

17

companies will trigger heightened scrutiny. *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 406 (Del. 1988); *Brundage*, 226 A.2d at 598. However, scrutiny is unnecessary when the two companies are a parent and its wholly-owned, solvent corporate subsidiary. *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *Bresnick v. Franklin Capital Corp.*, 77 A.2d 53, 56 (N.J. Super. App. Div. 1951), *aff'd*, 81 A.2d 6 (1951) (per curiam). Directors must act in the best interests of a corporation's shareholders, but a wholly-owned subsidiary has only one shareholder: the parent. There is only one substantive interest to be protected, and hence "no divided loyalty" of the subsidiary's directors and no need for special scrutiny of their actions. *Bresnick*, 77 A.2d at 56; *see also Anadarko Petroleum*, 545 A.2d at 1174. The VFI directors looked out only for Campbell's interest because, substantively, that was their duty; whether they thought they were acting in the interest of VFI or Campbell "seems inconsequential." *Bresnick*, 77 A.2d at 57.

VFB argues that *Bresnick* and *Anadarko* have not been followed and are bad law, urging that they would deny a wholly-owned subsidiary standing to sue its directors for a breach of fiduciary duty. But the two cases do not address the subsidiary's distinct legal existence and standing to enforce its directors' duties, a bedrock principle of corporate law. Rather, they address the distinct question of what duties a director owes the subsidiary. *See In re Scott Acquisition Corp.*, 344 B.R. 283, 287 (Bankr. D. Del. 2006); *First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 26 (D.D.C. 1998). Corporate duties should be as broad as their purpose requires, but it makes no sense to impose a duty on the director of a solvent, wholly-owned subsidiary to be loyal to the subsidiary *as against the parent company*. None of the cases VFB cites convinces us that the New Jersey Supreme Court would impose such a duty.

A duty of loyalty against the parent should arise whenever the subsidiary represents some minority interest in addition to the parent. That could happen if the subsidiary were not wholly-owned, *see Summa Corp.*, 540 A.2d at 407, but VFB concedes that Campbell was VFI's sole stockholder at the time of the spin.

18

It could also happen if the subsidiary were insolvent. Directors normally owe no duty to corporate creditors, but when the corporation becomes insolvent the creditors' investment is at risk, and the directors should manage the corporation in their interests as well as that of the shareholders. *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173 (3d Cir. 2002); *AYR Composition, Inc. v. Rosenberg*, 619 A.2d 592, 597 (N.J. Super. App. Div. 1993); *Francis v. United Jersey Bank*, 432 A.2d 814, 824 (N.J. 1981); *Whitfield v. Kern*, 192 A. 48, 54-55 (N.J. 1937). In such a situation, the loyalties of the VFI directors would be divided between Campbell and the banks that loaned money to VFI as part of the spin transaction, and the spin would be subject to heightened scrutiny. *See, e.g., Scott Acquisition*, 344 B.R. at 288 ("There is no basis for the principle . . . that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation"); *In re Sabine, Inc.*, No. 05-1019-JNF, 2006 WL 1045712 (Bankr. D. Mass. Feb. 27, 2006) (refusing to dismiss a complaint alleging that a company looted its insolvent, wholly-owned subsidiary of cash).

VFB contends that VFI was rendered insolvent by the spin, but this argument should sound familiar. VFI's pre-spin balance sheet contained nothing; its post-spin balance sheet contained $500 million in debt and the Specialty Foods Division. As noted above, the district court did not clearly err in valuing the division at well over $500 million, meaning that VFI's assets were easily greater than its debts. In *Whitfield v. Kern*, the New Jersey Supreme Court held that corporate duties to creditors arise in the context of equitable insolvency, "the general inability of the corporate debtor to meet its pecuniary liabilities as they mature, by means of either available assets or an honest use of credit." 192 A. at 55. The district court did not err under this test, either, given the market price of VFI's debt over time. In June 1999, well after the markets were aware of all information that might have been concealed about VFI's condition at the time of the spin, VFI was able to sell $200 million in unsecured debt. That debt continued to sell at par value until January of 2000, indicating that until that point VFI's creditors believed that VFI would pay its unsecured debt as it came due. The district

19

court did not clearly err in concluding that VFI was solvent, and for that reason VFI's claim for aiding and abetting a breach of fiduciary duty must fall.

### C. Campbell's Claims Against the VFI Estate

Finally, we reach VFB's appeal from the district court's allowance of Campbell's bankruptcy claims. Once a creditor alleges facts sufficient to support a claim, the claim is *prima facie* valid. 11 U.S.C. § 502(a); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Once such a claim is alleged, the burden shifts to the debtor to produce evidence sufficient to negate the *prima facie* valid claim, that is, "evidence equal in force to the *prima facie* case." *Allegheny Int'l*, 954 F.2d at 173. Here, VFB says that it objected to Campbell's claims in its complaint, but an unverified complaint is not evidence. VFB also claims that its own sworn answers to Campbell's interrogatories explain in detail why each of Campbell's claims is not allowable, but it admits that no one put these interrogatories into the record. The district court could not consider evidence that was not before it. Its decision to allow Campbell's claims was correct.

VFB's motion to amend the judgment included, in part, a request to reopen the record to permit it to introduce the verified interrogatory answers it had failed to submit before. Several potential problems prevented the relief VFB requested, but we need only discuss one: VFB filed its notice of appeal on November 1, 2005, depriving the district court of jurisdiction to grant its motion. *Venen v. Sweet*, 758 F.2d 117, 123 (3d Cir. 1985) (holding that the filing of a notice of appeal deprives the district court of jurisdiction to grant a motion to amend the appealed judgment). The striking of the motion to amend the judgment was not in error.

### III. Conclusion

For the foregoing reasons, we affirm both the district court's judgment and its decision to strike the motion to amend the judgment.

20