**In re M. SILVERMAN LACES,
INC., Debtor.**

**Robert L. Geltzer, as Successor
Chapter 7 Trustee,
Plaintiff,**

**v.**

**Howard Bloom, Leonard Edelson, Achille Gaetano, All Lace Processing Corporation f/k/a All Lace Corporation,: and Westchester Lace Corporation, Defendants.**

**Banktruptcy No. 97–43223(RDD).
Adversary No. 99–8600(RDD).**

United States Bankruptcy Court,
S.D. New York.

March 31, 2009.

Bryan Cave LLP, by Robert A. Wolf, Esq. and Omar A. Shakoor, Esq., for Plaintiff.

Fox Rothschild LLP, by Daniel A. Schnapp, Esq. and Samantha H. Evans, Esq., for Defendants Leonard Edelson and Westchester Lace Corporation.

*Memorandum of Decision on Chapter 7 Trustee's Claims Against Defendants Leonard Edelson and Westchester Lace Corporation*

ROBERT D. DRAIN, Bankruptcy Judge.

When the plaintiff (the "Trustee") was appointed successor trustee in this chapter 7 case in January 2004, he inherited this adversary proceeding, which commenced in September 1999. Leonard Edelson ("Edelson") and his wholly-owned corporation, Westchester Lace, Inc. ("WL," with Edelson, the "Defendants") are the only remaining defendants, the others having agreed to settlements. After lengthy negotiations failed, the Trustee and the Defendants went to a bench trial comprising testimony by five witnesses over three days, as well as an extensive documentary record. Thereafter, the parties submitted proposed findings of fact and conclusions of law. This memorandum sets forth the Court's findings of fact and conclusions of law underlying its determination that the Trustee has not proven his claims with the exception of certain claims that are, however, subject to a complete right of setoff.

### The Trustee's Claims

The Trustee asserts various claims arising under chapter 5 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, as well as breach of fiduciary duty. The Trustee claims that (i) WL obtained property of the debtor, M. Silverman Laces, Inc. ("SL" or the "Debtor") without paying for it or, alternatively by means of a setoff that is not sustainable under Bankruptcy Code section 553; (ii) WL obtained property of SL for less than reasonably equivalent value when SL was insolvent, had unreasonably small capital or SL intended or believed it would incur debts beyond its

ability to pay when due and, therefore, WL received an avoidable fraudulent transfer under Bankruptcy Code sections 544(b) (enabling the Trustee to avoid any transfer of an interest of the Debtor that is voidable under non-bankruptcy law by a creditor holding an allowable unsecured claim) and 548(a); and (iii) Edelson, a director and fifty percent shareholder of SL, breached his fiduciary duties to SL by wrongfully causing the diversion of the foregoing property to WL and effectively terminating SL's business, all to Edelson's advantage, and WL aided and abetted such breach.[1]

The Trustee seeks damages, an accounting and, where not duplicative, recovery of the value of the alleged fraudulently transferred property under Bankruptcy Code section 550, plus pre- and post-judgment interest.

WL counterclaims that the Debtor owed it a far larger amount on the chapter 7 petition date than any amount it might owe the Trustee. Although WL did not file a proof of claim for this debt, it contends that it is subject to setoff under Bankruptcy Code section 553 against any prepetition amounts owed SL.

### Jurisdiction

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(H), (K) and (O). Venue is proper under 28 U.S.C. § 1409(a).

### Facts

On May 14, 1997, several creditors, but not WL, filed an involuntary chapter 7 petition against SL. The Court signed an order for relief on June 18, 1997, and the original chapter 7 trustee, Sarah Lichtenstein was appointed that day.

---

1. The Trustee withdrew claims against the Defendants related to SL's transfer of a secu-    rity interest in accounts receivable to Hudson United Bank and The Bank of New York.

SL, a New Jersey Corporation, was a wholesaler and converter of lace goods. Tr.3, pp. 119–20;[2] Declaration of Achille Gaetano, dated February 21, 2008 ("Gaetano Decl.") ¶ 4.[3] It essentially was a middleman in the lace manufacturing process: it bought "greige goods" (undyed knitted goods), had third parties dye and finish them, and then sold the finished product to retailers and jobbers. Tr.3, pp. 101–03, 124–25; Gaetano Decl. ¶ 4. In addition to purchasing greige goods and seeing them through the finishing process, SL also bought finished lace products from third parties for resale. Gaetano Decl. ¶ 4. SL had a small number of proprietary designs for lace goods, and sometimes it had raw material finished according to these patterns. Geatano Decl. ¶ 5; Declaration of Leonard Edelson, dated February 21, 2008 ("Edelson Decl.") ¶ 23. Generally, however, SL had its greige goods finished according to "market patterns" bought from third parties. Tr.3, p. 102.

Faced with foreign competition, declining prices and rising costs, the U.S. lace industry fell on hard times in the mid–1990s; a number of SL's customers and competitors went out of business. Edelson Decl. ¶ 11; Gaetano Decl. ¶ 14; Tr.3, p. 102. SL had a net loss of approximately $2.4 million in 1995. Gaetano Decl. ¶ 14.

Defendant WL also was, and continues to be, engaged in the lace business, although on a broader scope than SL. WL knitted raw materials into greige goods, dyed and finished them from its own designs and sold the finished product to customers-that is, to retailers and jobbers, as well as to wholesalers and converters such as SL. Like SL, WL purchased greige goods from third parties, but, unlike SL, it dyed and finished them for resale to wholesalers, converters, retailers and jobbers. WL also contracted to dye and finish greige goods owned by third parties, such as SL, who would resell the finished product. Edelson Decl. ¶¶ 14, 19–20; Tr.3, pp. 137–38.

WL also experienced a downturn in its business in the mid 1990s. The number of its customers shrank, Tr., p. 163; Edelson Decl. ¶ 11, as did its net sales, declining from approximately $27.5 million in 1994 to approximately $25.7 million in 1995. Ex. P20A; Ex. P20B.[4]

From 1992 through 1995, SL had two shareholders, Achille Gaetano and Alvin Bloom. Recognizing SL's declining fortunes at the end of 1995, they decided to form an "alliance" with WL, with which SL had already been conducting some business. Tr., p. 62; Tr.3, pp. 101–02. In return for investing $50,000, on January 1, 1996, Edelson, thus became a fifty percent shareholder of SL, as well as a director. Edelson Decl. ¶ 26; Tr.3, p. 131. He remained the sole shareholder of WL. Ex. P2; Tr.3, p. 131.

Although there was fairly extensive testimony regarding the scope of the "alliance," only one agreement exists governing the relationship: a one-page Requirements Agreement executed by the parties on May 17, 1996 but dated "as of January 1, 1996." Ex. D1. The Requirements Agreement states that SL shall

---

**2.** Citations to "Tr., p. ___" refer to the trial transcript of February 28, 2008; citations to "Tr.2, p. ___" refer to the trial transcript of February 29, 2008; citations to "Tr.3, p. ___" refer to the trial transcript of March 3, 2008.

**3.** Consistent with the Court's general practice, witnesses' direct testimony was in the form of affidavits or sworn declarations, subject to cross-examination and re-direct.

**4.** The Trustee's exhibits are cited as "Ex. P___", the Defendants' as "Ex. D___", and the parties' joint exhibits as "Ex. J___".

give WL all of its "business relating to lace knitting and dying, provided that the prices charged by [WL] to [SL] are competitive with other knitters and dyers." WL agrees to "accept the work and perform in accordance with the usual industry standards but not to increase its capacity in order to fill" such orders. SL is free to give orders to others if WL cannot or does not accept SL's business. Either party has the right to terminate the agreement if Edelson or any member of his family ceases to own a controlling interest in WL or ceases to be a stockholder of SL. *Id.* The Trustee does not assert a claim that WL breached this contract.

The two companies never merged. The Trustee has not alleged that there was a de facto merger, either, or that SL and WL became alter egos or that WL's corporate veil should be pierced in order to subject WL to SL's debts. SL and WL had different employees, books and records, computer systems, bank accounts and, until shortly before the involuntary chapter 7 petition, offices. Edelson Decl. ¶ 28; Tr.3, pp. 68–70, 95, 115.

Edelson's role in managing SL appears to have been limited. SL did not pay him a salary or other compensation. Gaetano and Bloom, who were salaried officers as well as shareholders, managed SL's day-to-day operations, including placing orders and sales. Edelson Decl. ¶ 27. Edelson was to focus on dying and finishing, *id.*, in keeping with WL's role under the Requirements Agreement. By locking in WL as its source for dying and finishing, SL believed that it would improve the quality and delivery of its product. *Id.* ¶ 24; Gaetano Decl. ¶ 17; Tr.3 p. 102. There seems to have been a general sense that SL

would also benefit from association in the industry with Edelson, an experienced operator, and with WL, a larger and financially stronger company than SL. Gaetano Decl. ¶ 17; Edelson Decl. ¶¶ 24–25; Tr.3, pp. 102, 161–63. The two companies also obtained ready access to each other's proprietary designs and the ability to sell goods cut according to those designs to their respective customers, Gaetano Decl. ¶ 28; Edelson Decl. ¶ 33, although the number and value of WL's proprietary designs greatly exceeded SL's. Tr.3, p. 19–21; Gaetano Decl. ¶ 5; Edelson Decl. ¶ 23.[5] Both parties hoped that WL would gain a reliable and increasingly more successful customer in SL. Tr.3, pp. 123–24.

Probably none of the foregoing would have led the Trustee to raise a claim against the Defendants but for another aspect of the "alliance." Starting in 1996, SL and WL "pooled" their customers. More specifically, having instructed their salesmen to identify their customers, as well as pricing and sales volume information, Gaetano Decl. ¶ 29; Tr., pp. 79, 82, Gaetano, Bloom and Edelson allocated certain of the companies' respective customers to SL salespeople and certain to WL salespeople. Gaetano Decl. ¶ 29; Edelson Decl. ¶ 33; Tr.3, pp. 45–6.

The rationale for this decision was frankly non-competitive. Before the "alliance," SL and WL had competed by selling their goods to many of the same customers, often to both companies' detriment. As Gaetano testified, before the alliance, "[w]e were kind of beating each other up on the customers, so we put this together so that we would stop doing that." Tr.3, p. 45. Edelson stated that "We had both sold a lot of these

---

**5.** In fact, Edelson and Gaetano had originally become acquainted over a dispute regarding SL's conceded misappropriation of some of

WL's designs. Edelson Decl. ¶¶ 21–22; Tr.3, p. 102.

customers. That also was part of why we entered into the alliance, was so that we would stop both companies going in to the same customers.... We just had to figure out who would be best served to sell different customers." Tr.3, p. 103.

The guidelines by which WL and SL implemented their customer allocation were unwritten and vague. It appears, though, that Edelson, Bloom and Gaetano intended to maximize sales for each company based on the strength of the respective salespeople's relationships. Gaetano testified, for example, that the companies allocated their customers in light of the fact that SL's salespeople were more successful at "West Side sales," which featured outerwear, while WL's salespeople were more established at "East Side sales," which featured lingerie. Tr.3, p. 121. Moreover, after turnover in SL's sales force, a WL salesperson was transferred to service SL's customers, for SL's benefit. Gaetano Decl. ¶ 30.

The "alliance" did not result in any formal agreements between SL and WL, however—such as a nondisclosure or non-compete agreement—expressly preventing their selling to each other's newly allocated customers. Gaetano Decl. ¶¶ 22–23; Tr., p. 71; Tr.3, pp. 104, 117, 150. Nor were the companies' employees bound by non-disclosure or non-compete agreements. Gaetano Decl. ¶¶ 12–13; Edelson Decl. ¶ 36. (The Trustee's accountant, Andrew Plotzker, acknowledged that it was not improper for SL's former salespeople to sell to the same customers they had sold to while working at SL. Tr., p. 132.) Nor was the identity of the companies' respective customers kept secret after the "allocation." Tr.3, p. 122. Thus, SL and WL's allocation of customers is best viewed as a loose, non-binding practice; if either company's salespeople grew less successful at making sales, the practice's rationale no

longer supported allocating customers to those salespeople. Gaetano Decl. ¶¶ 29–30. As the Trustee's witness Mr. Plotzker testified, "I never specifically reviewed an agreement because I don't think it exists. But my understanding is if a customer was buying more [WL] goods from a particular salesman of [WL's] and lesser [SL] goods from a customer of [SL's], then for expediency purposes the [WL] salesman would solely visit that customer and show [SL] styles, at that time. And if the customer bought [SL] styles, [SL] was credited for those sales." Tr., p. 77.

This reflects that in the lace industry, "customer lists" have negligible value because lace companies readily ascertain the customer base given a generally high turnover both of customers and salespeople. Declaration of Geremy Bernstein ("Bernstein Decl."), dated February 21, 2008, ¶¶ 6–8; Gaetano Decl. ¶¶ 7–9, 22; *see also* Tr., pp. 71-2. Salespeople canvass buildings in New York City's Garment Center and make cold calls; they succeed or fail largely based on their ability to satisfy customers' current needs as to quality of product, style and price. Bernstein Decl. ¶¶ 10–11; Gaetano Decl. ¶ 8; Tr., pp. 72-74. Indeed, SL may not have had a specific "customer list." As Mr. Plotzker noted, "Mr. Ventricelli [the original trustee's accountant], during his tenure accumulated lists of debtor's customers, we've seen that. But if you're asking me if I've seen a pre-printed customer list that the Debtor would have held out to be its customer list, I have not seen that." Tr., p. 80; *see also* Tr., p. 116; Tr.2, p. 33. In any event, Plotzker could not put a value on SL's customer list except to say that "I'm certain it's worth more than zero [dollars]." Tr., pp. 63-4

One might think that Gaetano and Bloom would have been somewhat wary of forming such an open-ended alliance with a

more integrated and financially stable business like WL; however, they do not appear to have feared that WL would abuse the "alliance" to siphon off SL's business. (Of course, they had every incentive to protect SL from such encroachment; they had no financial interest in WL, whereas Edelson had twice the economic stake in WL that he had in SL.) In fact, Gaetano testified credibly that he and Bloom could, and did, adequately police WL to ensure that the allocation of customers, which Gaetano thought had initially been fair to SL, remained fair. Tr.3, pp. 121–22. He felt that it was in WL's better interest to retain SL as a strong and dedicated customer rather than to steal SL's business. *Id.* at 123–24; *see also* Gaetano Decl. ¶ 24 ("[SL] and [WL] always dealt at arms-length and paid fair consideration for the goods and services ... purchased from one another."), ¶ 35 ("At all times, Edelson remained committed to improving [SL's] financial position.").

Edelson also asserted that during the roughly sixteen months of the "alliance"—that is, before SL's bankruptcy—WL and SL consistently allocated their customers and goods fairly, or, in Edelson's words, "honorably." Tr.3, pp. 150–51.

The Trustee, on the other hand, contends that the relationship tilted improperly over time in WL's favor. More specifically, the Trustee alleges that in the four-and-a-half months of 1997 preceding SL's bankruptcy, WL generated at least $1,670,864 in direct sales, for its own benefit, to "SL's customers." See Ex. P13, Ex. P38 (WL's accountant's notes and the 1997 General Ledger Trial Balance refer to sales in such an amount being to "customers gone to Lace by merger" and as

"Sales-[SL]," respectively); Ex. P14 (letter to Edelson by WL's accountant, Anthony Romano, referring to "post-merger sales of [SL]"); Tr., pp. 207, 209, 135, 137, 142, 145. In addition, the Trustee points out that in 1996, WL sold $2,155,497 of "WL style goods" to SL, whereas WL sold only $167,678 of "WL style goods" to SL in the four-and-a-half months of 1997 preceding SL's bankruptcy (in each case for ultimate re-sale by SL to its own customers). Tr.3, pp. 42–3; Ex. P20C. According to the Trustee, this significant reduction must reflect that WL poached SL's customers, to whom it must have started selling "WL style goods" directly. Finally, the Trustee notes that after three years of declining sales WL's aggregate sales increased by approximately $3,365,000 in 1997 over the previous year.[6] Such an increase, he contends, particularly in a generally down market, Tr.2, pp. 70–5, must have been attributable to WL's misappropriation of SL's customers and, ultimately, of SL's business.

The Trustee bolsters his argument as follows: in the two weeks before the involuntary chapter 7 petition, SL moved its offices to WL's office space, Tr.3, pp. 68–70, 132–33; shortly after the involuntary petition was filed, Gaetano and Bloom, three other SL salespeople, and two other SL employees went to work for WL, Tr.3, pp. 83–85, 89, 91, 93, 174–77; SL's inventory was stored with WL before the involuntary chapter 7 petition, Tr.3, pp. 70, 75; and, within two days after the involuntary petition, WL was selling SL's inventory for its own account (using the services of SL's former employees) and continued to do so without, perhaps, directly informing the

---

6. WL's net sales were approximately $27,533,000 in 1994, $25,705,000 in 1995, $22,490,049 in 1996 and $25,875,000 in 1997. Ex. P20A; Ex. P20B; Ex. P21A; Ex. P21B.

original chapter 7 trustee [7] and certainly without obtaining the Court's authority to do so. Tr.3, pp. 70, 76, 80, 151–52, 171, 193–94, 203. Indeed, WL continued through 2004 to sell for its own account what had been stored as SL's inventory. Ex. D16; Tr., pp. 201–02; Tr.3, pp. 168, 170. Referring to such sales, Gaetano, who, as noted, became an employee of WL shortly after the involuntary petition was filed against SL, acknowledged, "[I]f we were going to be working at [WL], it was important for us to keep a relationship with the customers. If we were going to stay in the business, whether it was with [WL] or anybody else, we were trying to keep a relationship with the customers." Tr.3, pp. 96–98.

These facts do not bode well for the Defendants, as they resemble in some respects a classic "bust out" scenario, in which a closely held company improperly seeks to avoid paying its debts by going out of business, only to continue business surreptitiously in the guise of another entity controlled by the same insiders, or an improper diversion of SL's business to WL.

The trial revealed significant differences, however, between the typical "bust out" or diversion of business, whose impropriety ultimately derives from insiders' appropriation of value that would otherwise have been available to pay creditors, and the relationship between SL and the Defendants.

First, and most importantly, the Trustee has not established that property of SL was transferred to the Defendants improperly.[8] The most obvious transfer to identify would be WL's postpetition sale of SL's inventory. However, the Trustee has not attempted to provide any valuation showing that SL received less than fair consideration in respect of these sales. Tr., p. 218 (Plotzker acknowledges that he has not opined that such postpetition sales were improper). The explanation for the Trustee's reticence on this point is somewhat convoluted, but understandable. It appears that WL did not keep the inventory, or its proceeds, for its sole benefit. Instead, WL used the inventory and its proceeds to pay down Hudson United Bank ("HUB"), SL's secured creditor that held a lien on, among other things, the inventory, in exchange for reasonably equivalent value.[9]

On June 16, 1997, approximately one month after the filing of the involuntary petition and two days after the appointment of the original trustee, HUB moved for relief from the automatic stay under Bankruptcy Code section 362(a) to exercise its rights in its collateral, Ex. 46A, which the original trustee at first opposed. Ex. 46B. At that time, there may already have been an oral agreement between HUB, SL and WL to permit WL to sell HUB's collateral. An appraisal by Daley–Hodkin Appraisal Corporation, dated May 23, 1997, on behalf of HUB (the "Daley–Hodkin Appraisal"), stated "[W]e met with Howard Bloom, of Silverman, and Len Edelson, of Westchester, who informed us that an agreement had been reached between Hudson United Bank, [SL] and [WL], which allowed [WL] to purchase the

---

7. As discussed below, some evidence suggests, to the contrary, that the original chapter 7 trustee knew that WL was selling SL's inventory postpetition.

8. With minor exceptions, discussed below.

9. It is the law of the case that HUB had a valid and non-avoidable lien on, among other assets, SL's inventory and the proceeds thereof and general intangibles. *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, 2002 WL 31412465, 2002 U.S. Dist. LEXIS 20288 (S.D.N.Y. Oct. 23, 2002).

majority of [SL's] inventory and assets." Exhibit C to Ex. 46A. In any event, after the automatic stay was lifted, WL eventually paid HUB for the SL inventory that WL had previously sold, as well as for the HUB collateral that was still under WL's control. Tr.3, p. 199; Exs. D14, D16. The evidence shows that the price paid by WL to HUB, relieving SL of HUB's secured claim in such amount, was fair. Thus, SL's estate and creditors were not harmed.

As reflected in an undated Bill of Sale that was apparently prepared some time in 1998, WL paid HUB $602,071.64 for SL's former inventory (most of which WL had already sold, Tr.3, pp. 168–70) and miscellaneous office furniture, business machines and equipment of negligible value. Exs. D14 (Bill of Sale), D16 (schedule of "Original Silverman Inventory Invoiced by Westchester"). The actual cost to WL may have been approximately $40,000 lower, Tr., pp. 99–100, but the full HUB debt was satisfied.

The Trustee and the Defendants agree that HUB dictated the terms of the sale and that the price paid by WL almost exactly matched the amount of the HUB debt, plus interest to the date of payment. Edelson Decl. ¶ 76 n. 4; Tr.3, pp. 201, 203–04. This still leaves open, of course, whether the price was fixed to SL's detriment at the amount of the HUB debt, or whether the value of HUB's collateral was equal to or even lower than the price WL paid HUB.

The fact that Edelson had guaranteed $300,000 of the HUB debt, Tr. 3, pp. 48–50, does not necessarily support either view. It may have led him to cause WL to overpay HUB in order to relieve himself of the guaranteed debt; on the other hand, he may well not have been motivated to pay a price higher than the HUB debt, even if the goods were worth more.

More useful, however, is the Daley–Hodkin Appraisal, dated only several days after the filing of the involuntary chapter 7 petition. Ex. D46A. The Appraisal states that the total original cost (to SL) of the inventory, as of April 30, 1997, was $796,000. *Id.* at 3. (This is also the aggregate approximate dollar amount of inventory listed on a schedule to the Bill of Sale between WL and HUB. Ex. D14.) The Daley–Hodkin Appraisal states that the auction sale value of the foregoing inventory, however, was only approximately $250,000, before the cost and expenses of sale. Ex. D46A.[10]

The Daley–Hodkin Appraisal was an exhibit to HUB's motion for relief from the automatic stay.[11] The original chapter 7

---

**10.** It should be noted, though, that the Daley–Hodkin Appraisal was only a "walk through"; the appraiser did not have enough confidence in his examination of SL's inventory to do more than perform a rough discount (of 65% to 70%) off of the inventory cost information that SL had provided him. *Id.* On the other hand, the Trustee did not effectively challenge the underpinnings of that inventory cost information.

**11.** This, then, raises the issue whether the original chapter 7 trustee actually knew that WL was selling SL's inventory subject to the agreement to pay HUB for it later. Regardless whether the original trustee knew this, it is clear that she never exerted control over the inventory (or did anything to stop SL's former managers going to work for WL or WL's selling to SL's former customers). On the other hand, these choices by the original trustee did not rise to the level of a formal abandonment of SL's property to WL or a waiver of claims against WL. *See* Bankruptcy Code section 554, which requires notice and the opportunity for a hearing before abandonment of estate property; Bankruptcy Rule 6007 (same). Moreover, the original trustee's agreement to the lift-stay stipulation with HUB, discussed below, did not waive any interest of the estate in HUB's collateral in excess of the amount of HUB's secured claim.

trustee then instructed her appraiser, GEM Auction Corp., to prepare an appraisal of SL's assets, which is dated November 12, 1997. Ex. D15 (the "GEM Appraisal"). GEM reached even a lower auction sale value for SL's inventory: $151,000 (plus $13,657 for office furniture and equipment, for a total of $165,097). *Id.* The GEM Appraisal suffers from a similar problem to the Daley–Hodkin Appraisal, however: it is not clear whether GEM was reviewing all of SL's inventory, or even the same inventory that Daley–Hodkin was reviewing. The GEM appraisal refers to 488,000 yards of finished goods and 36,000 pounds of greige goods; on the other hand, the Bill of Sale (Ex. D14), which, as noted above, sets forth cost information that is close to the cost information relied on by the Daley–Hodkin Appraisal, refers to 579,519 yards of finished goods and 67,854 pounds of greige goods. However, given GEM's severe discounting of the value of the greige goods and the assumptions underlying its per-yard appraisal of the finished goods, it appears that even if GEM had reviewed the larger inventory reflected in the Bill of Sale, GEM still would have posited an auction sale value substantially lower than the price WL paid HUB. (Undoubtedly partly because of the GEM Appraisal, the original trustee determined to withdraw her objection to HUB's motion and to stipulate to lifting the automatic stay to permit HUB to enforce its interest in the collateral. Ex. D7.)

Finally, it is undisputed that after WL sold all of SL's inventory in the course of its ongoing business, WL experienced a loss on the price it paid HUB, even before deducting the costs of processing, the costs of sale and overhead. Edelson Decl. ¶ 76; Ex. D16; Tr., p. 220. It therefore is clear that even on a going concern basis (and, as discussed in greater detail below, SL was not a going concern at the time of the involuntary petition), WL paid reasonably equivalent value for this SL inventory.

Having dealt with the inventory, the only specific transfers that the Trustee identifies as having been made to WL for less than reasonably equivalent value are an unpaid receivable of $133,866 for goods sold and delivered to WL between February 2, 1996 through May 2, 1997, Ex. P23, and the sale by SL to WL of goods at a claimed 10 to 25 percent discount, allegedly in excess of fair value in the aggregate amount of $15,000 to $25,000. Tr., pp. 191–97. Declaration of Andrew Ploztker, dated February 21, 2008, ¶ 48 ("Plotzker Decl.").

The Defendants do not dispute the $133,866 account receivable. Tr.3, pp. 178–79. They point out, however, that it is also undisputed that SL had a prepetition account payable to WL in the aggregate amount of $564,496.55, Edelson Decl. ¶ 53; Tr.3, p. 47–48, 150, which, they contend, may be set off against any prepetition debt WL owes SL. As discussed below, such a setoff would be proper; therefore, no cash payment is required on the WL receivable.

The Defendants also effectively disputed whether any discounts from SL to WL were improper, as well as the Trustee's method of quantifying the alleged improper discounts. First, they noted that Mr. Plotzker acknowledged that it is common in the lace industry to offer customer discounts, particularly to high volume customers like WL was to SL. Tr., pp. 50, 51, 215. Given that fact, Plotzker was required to undertake a systematic analysis of SL's pricing in general or at least of the discounts that SL generally was offering other customers, including customers like WL, to determine whether the particular discounts offered to WL were out of line. Plotzker did not do this; instead, he took what he claimed were several "at random"

samples of other SL customer pricing (nine or ten customers from a customer base of over 1,000), without analysis of the type of order placed or the level of the customer's business with SL. *Id.* pp. 49, 82–83. Thus, there is no way for the Court to know whether the ten to twenty-five percent discount that Plotzker contends SL gave WL was customary in SL's business, reflecting fair pricing, or was completely out of line, or somewhere in between. Obviously this leaves the Trustee's estimate of damages attributable to discounts open to considerable doubt; for example, if it was a general practice to offer 10 percent discounts to customers like WL, Pltozker's low-end damage estimate would be zero and his high end damage estimate would be reduced from $25,000 to $15,000.

Thus, Pltozker's "random test" (i) raised the danger of being unduly skewed by the limited data analyzed and (ii) did not account for whether entries in this small batch reflected purchases of only a lace sample (which would generally be at a lower price), or for embellishments (which would add to the price), or for whether the order was large—all suggesting that the analysis may well have compared apples to oranges. Tr.3, pp. 104–09.[12] Both Edelson and Gaetano asserted contrary to Plotzker's analysis, moreover, that WL routinely gave SL a fifteen percent discount while SL routinely gave WL only a five percent discount. Edelson Decl. ¶ 78; Gaetano Decl. ¶ 50. In light of the foregoing flaws and the absence of any meaningful cross-examination of Edelson or Gaetano on the latter point, the Trustee cannot be said to have established that WL obtained any unfair discounts from SL.

This leaves the Trustee with liability theories based on more nebulous transfers to WL, all allegedly occurring before the involuntary petition date: of SL's "good will" or business, or, perhaps, of corporate opportunities to sell to "SL customers." At the trial, the Trustee also floated a theory, not described in the complaint, that Edelson (and Bloom and Gaetano) should have placed SL under the protection of chapter 11 in early 1997, months before the involuntary petition, to protect SL's intangible going concern value.[13] Tr., pp. 124–25, 129. The Trustee argued that by failing to do so, Edelson breached his fiduciary duties of care and loyalty and that WL assisted him in the latter breach.

Such a strategy would have meant that SL would have eschewed what actually happened, which is that SL obtained HUB's forbearance and over $200,000 of new credit in January 1997 in return for the grant to HUB of a lien on inventory. *Cuevas v. Hudson United Bank (In re Silverman Laces, Inc.)*, 2002 WL 31412465, **1–2, 2002 U.S. Dist LEXIS 20288, *2–3 (S.D.N.Y. Oct. 23, 2002). Instead, SL would have tried to use its unencumbered inventory and accounts receivable to assist in financing its business in chapter 11 and litigated with HUB over use of cash collateral, adequate protection and confirmation of a reorganization plan or a going concern sale. Tr., pp. 168–88. At the trial, Plotzker elaborated on his and the Trustee's view that, in the light of (a) SL's gross sales in 1996, (b) Plotzker's assessment of what SL's 1997 gross profit percentage should have been (a "conservative" 17 percent), and (c) his view of the likely costs of such a chapter 11 strategy,

---

12. Mr. Plotzker also did not satisfactorily convince the Court that this sample was indeed random.

13. Without positive net earnings and a resulting positive going concern value, Plotzker acknowledged that SL would not have had "good will," Tr., pp. 129–30, which, therefore, could not have been transferred to WL.

SL would have had over $5 million in sales, over $850,000 of gross profits, and $185,000 of positive earnings before interest, depreciation and taxes ("EBITDA") in 1997 if SL's board and shareholders had followed such a course. *Id.* at pp. 159–68. From that hindsight analysis, the Trustee assumes that SL's going concern value could have been approximately $550,000. Plaintiff–Successor Trustee's Proposed Findings of Fact and Conclusions of Law ¶ 141.

None if this is supported by the facts, however, or-with regard to the ability of SL to achieve a going concern value of $550,000 from a hypothetical $185,000 of EBITDA—a competent going concern valuation.[14]

The Trustee failed to show, for example, that *WL,* a going concern, made a net profit on SL's alleged improperly transferred customers. Instead, the evidence showed that WL experienced a net loss in 1997, including on such "transfers," of customers and inventory allegedly taken from SL, Tr., p. 220; Tr.2, pp. 24–25; Tr.3, pp. 152–53, 196, 199–01; Ex. P20C. Moreover, WL's gross profit percentage in 1997 was six percentage points lower than the percentage that Plotzker projected SL should have earned in 1997. Tr., p. 160.[15] It is also clear that *SL* was in a far worse financial condition than WL at the beginning of 1997, and, in all likelihood, that it could not have survived as a going concern. SL had defaulted on the HUB loan. *In re Silverman Laces,* 2002 WL 31412465, *1, 2002 U.S. Dist. LEXIS 20288, at *2; Ex. P22. It was in arrears on its lease and

lacked the wherewithal to pay rent. Tr., p. 216. And Plotzker's calculations were predicated on SL's not only continuing but also improving its alliance with WL as a "strategic partner," including the transfer of SL's offices (as well as the storage of its goods) rent-free to WL's premises on a long-term basis, Tr., pp. 173, 176, 181, while it is undisputed that during 1996 SL had built up a past due payable (excluding any rent) to WL in excess of $564,000, Tr. pp. 47, 139; Edelson Decl. ¶ 53. In addition, SL's accounts payable forecast showed that approximately 75 percent of the amounts it owed to other vendors were past due and unpaid as of December 12, 1996. Ex. P22; Ex. P39. Indeed, the Trustee asserts that WL was insolvent continuously from no later than December 31, 1996 through and including June 18, 1997, the date of the order for chapter 7 relief. Plaintiff–Successor Trustee's Proposed Findings of Fact and Conclusions of Law ¶ 109.

Then, on the cost side, in addition to unreasonably assuming that SL could continue to satisfy its space needs rent-free from WL, Plotzker assumed no cost for conducting the hypothetical chapter 11 case and underestimated the cost and likelihood of obtaining financing to operate as a going concern in such an environment.

In sum, as a factual matter the Trustee's theory that SL had going concern value to save, and thus that it had good will or some other intangible asset whose value was premised on SL's having a positive going concern value that WL could have appropriated, is not credible. Although a

---

14. At the trial, the Court found that the Trustee's proposed expert on valuation issues lacked experience and qualifications in valuing businesses, generally, and businesses in this area, in particular, and therefore did not qualify him as an expert on going concern valuation.

15. Mr. Plotzker conceded that, leaving aside any other adjustments that might have to be made to his assumptions, if SL's gross profit percentage in 1997 were as low as WL's, SL would have negative net earnings, negative net worth and no meaningful intangible assets. *Id.,* pp. 165–66.

board and controlling shareholders might have considered such a chapter 11 strategy,[16] it is clear that a reasonable board and shareholders would not have found it persuasive, compelling or even reasonable to pursue in the light of SL's financial condition and prospects.

Moreover, there were also serious problems with Plotzker's extrapolation from a combination of WL's and SL's records of an assumed $5 million 1997 SL gross sales figure (premised on SL's staying in business and maintaining an alliance with WL). This is because Plotzker's extrapolation was based, without adequate support, on the assumptions that (a) WL did not share customers with SL prior to the "alliance," (b) WL did not give up customers to SL but only that SL gave up customers to WL, and (c) WL should not have sold "WL goods" to "SL customers" even when SL's ability to pay WL for "WL goods" for resale to "SL customers" was in serious doubt, as reflected by SL's past due debt to WL in excess of $564,000 and SL's insolvency. Tr., pp. 76–79, 148–49, 156–57; Tr.2, pp. 101–03, 106–07; Edelson Decl. ¶¶ 37–38.

Therefore, although Plotzker attempted to put hard dollar numbers on the value that the Trustee contends WL misappropriated, with the exception of the conceded $133,866 account receivable, such calculations ultimately rest on unsupported foundations.

### Discussion

■ A. *The Trustee's Fraudulent Transfer Claims.* The Trustee raises intentional fraudulent transfer claims under

New Jersey's[17] version of the Uniform Fraudulent Transfer Act ("UFTA"), *see* N.J. Stat. Ann. ("N.J.S.A.") § 25:2–25a, which he invokes under Bankruptcy Code section 544(b)(1), as well as under Bankruptcy Code section 548(a)(1)(A). He also raises constructive fraudulent transfer claims under N.J.S.A. § 25:2–25b, which he invokes under Bankruptcy Code section 544(b)(1), as well as under Bankruptcy Code section 548(a)(1)(B). "The purpose of the Fraudulent Transfer Act, N.J.S.A. 25:2–20 to –34, is to prevent a debtor from placing his or her property beyond a creditor's reach," *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 475, 732 A.2d 482 (N.J.1999) (citations omitted), and fraudulent transfer law generally has a similar purpose, to defeat transactions that remove a debtor's assets from creditors. *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir.2005).

■ Thus, to establish a constructive fraudulent transfer under either N.J.S.A. § 25:2–25b or Bankruptcy Code section 548(a)(1)(B), the Trustee must establish (in addition to SL's insolvency or undercapitalization or belief that it would incur debts beyond its ability to pay at the time or as a result of the transfer, which is here uncontroverted) that SL did not receive reasonably equivalent value in exchange for the transfer.

■ The UFTA lists eleven non-exclusive factors for courts to consider in determining actual intent to hinder, delay or defraud creditors. N.J.S.A. § 25:2–26.[18]

---

**16.** In fact, Gaetano testified that he met with a lawyer in the second half of 1996 to discuss SL's financial problems, but determined not to pursue a bankruptcy strategy. Tr.3, pp. 51–52.

**17.** There is no dispute that, except as superseded by the Bankruptcy Code, New Jersey

law applies to this dispute involving a New Jersey debtor and alleged transfers of property that took place in New Jersey.

**18.** "In determining actual intent under subsection a. of R.S. 25:2–25 consideration may be given, among other factors, to whether: a.

Courts consider similar "badges of fraud" giving rise to an inference of intent under Bankruptcy Code section 548(a)(1)(A).[19] Although it is possible for a transfer for reasonably equivalent value to be avoided as long as actual intent to hinder, delay or defraud creditors is proven, *United States v. McCombs*, 30 F.3d 310, 327–28 (2d Cir. 1994), review of the foregoing factors again shows the importance of whether reasonably equivalent value was provided in exchange for the transfer, or whether the transfer depleted assets otherwise available for creditors.

■ Even more fundamentally, each of the relevant statutes references the avoidance of a "transfer"; if nothing of value was transferred (or no obligation was incurred), there is nothing to avoid and recover for the estate. It is on the key issues of whether (a) property of SL was transferred (b) without SL having received reasonably equivalent value in exchange that the record shows the Trustee has not met his burden.

■ Most of the transfers that the Trustee asserts were fraudulent were not even transfers of SL's property. For example, even if there had been a customer list that SL disclosed to WL, which, as noted above, is questionable, the list did not contain information of value that had been kept secret and, therefore, there would not have been a "transfer" for avoidance purposes. SL's customers were generally known and accessible to SL's competitors, as were WL's customers (which, even before the "alliance," overlapped with SL's). No one at SL was contractually restricted from disclosing SL's customers to third parties or selling goods to such customers if subsequently hired by SL's competitors. Nor was WL bound by any non-compete or confidentiality agreement with SL. As a matter of law, therefore, any customer lists obtained by WL from SL (which was not engaged in a service business) did not rise to the level of a protected trade secret. *See Component Hardware Group, Inc. v. Trine Rolled Moulding Corp.*, 2005 WL 1514190, **35–37, 2005 U.S. Dist. LEXIS 32276, at *116–120 (D. N.J. June 27, 2005); *Subcarrier Commc'ns, Inc. v. Day*, 299 N.J.Super. 634, 691 A.2d 876 (1997).

---

The transfer or obligation was to an insider; b. The debtor retained possession or control of the property transferred after the transfer; c. the transfer or obligation was disclosed or concealed; d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; e. The transfer was of substantially all of the debtor's assets; f. The debtor absconded; g. The debtor removed or concealed assets; h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." N.J.S.A. § 25:2–26.

**19.** *See, e.g., Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 809 (Bankr.S.D.N.Y.2005) ("Common badges of fraud that give rise to an inference of intent include: (1) lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction.").

Nor was there a sufficient showing that WL surreptitiously obtained any other information that rightfully should have been retained by SL because it was developed by SL solely for its own use, such as customers' buying habits, mark-up structure, merchandising plans, projections or product strategies—information that would have made the customers uniquely "SL's customers." *Contrast Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 770 A.2d 1158, 1166–67 (2001); *and Platinum Mgmt., Inc. v. Dahms*, 285 N.J.Super. 274, 666 A.2d 1028, 1038–39 (1995) (finding liability where such facts were established), *with Fox v. Goz (In re Target Indus., Inc.)*, 2008 WL 4186898, **23–26, 2008 Bankr.LEXIS 2775, at *64–72 (Bankr. D.N.J. Aug. 28, 2008) (finding no liability where such facts were not established).[20] Edelson did not have a duty as a director of SL to preserve the secrecy of a customer list or other information that was not secret; for the same reason WL did not improperly obtain SL's customers. *Id.*

■ Similarly, the Trustee has not identified the transfer to WL of any proprietary designs or patterns owned by SL that actually were protected by a trademark, copyright or patent. In addition, Mr. Plotzker acknowledged that the number of designs that he characterized as "SL's" was "very, very small," indeed, only a few, Tr., pp. 84–85, that he could not say whether any of those designs were transferred to WL or sold by WL to customers, *id.* p. 85, and that he was not aware of anything that prohibited WL from acquiring them from the third parties who prepared them for SL. *Id.* p. 119. In addition, he testified that he was not aware of any contract with SL that WL had breach-

ed, including any with respect to the designs. *Id.* p. 82. The designs, therefore, had no transferable value.

■ Similarly, it is conceded that SL had no non-compete or restrictive agreements with its employees. After they left SL, they were free to work wherever they chose and to sell to whomever they chose. Tr., p. 132. SL had no property interest in their services and thus nothing to transfer to WL when SL did not stop its former employees from working for WL.

■ Tacitly acknowledging that none of the foregoing would separately constitute a fraudulent transfer, the Trustee nevertheless argues that SL transferred its "business" or "good will" by permitting WL to take over "SL's" employees and customers, relying heavily on *AYR Composition, Inc. v. Rosenberg*, 261 N.J.Super. 495, 619 A.2d 592 (1993). The difference between *AYR* and the present facts, however, is telling. In *AYR*, the principals of a closely held corporation went to work for a new company while the old company was being sued, bringing with them the old company's customer list and open customer accounts as well as all but one of the old company's employees. 619 A.2d at 596. The court had little trouble in determining that the principals had breached their fiduciary duties to the old company and that the commissions they earned from the accounts they had taken were fraudulent transfers. *Id.* at 598. Importantly, however, and in contrast to the present facts, the old business was an advertising agency, which the court found to be a service business; thus, the customer list and customer accounts, which the old company generally kept secret, had value. It was this that made their transfer susceptible to

**20.** The Trustee also failed to show that WL successfully solicited open SL business, as opposed to selling to SL's customers after SL was unable to do so, or that WL used confidential information to poach SL's customers. *Comprehensive Med. Commc'ns, Inc. v. Pinnacle Commc'ns Group, Inc.*, 2005 WL 280452, at *15 (N.J.Super.Ct.A.D. Jan. 31, 2005).

avoidance under the UFTA. "Where a company's business is to provide services, information about customers is a property right of the company. This is proper because a service company must obtain its customers at the cost of time, trouble and expense in soliciting ... them as customers. Where a service company is concerned, the names and addresses of its customers are not open to and ascertainable by every one; they are the private information and property of the company." *Id.* at 597 (internal quotations and citations omitted). In contrast, it has long been the case in New Jersey that "where customers are known in an industry or are easily discernable and personal contacts are taken from job to job, the rule is different," *Subcarrier Commc'ns, Inc.,* 691 A.2d at 881, and "customers are not assets where [a] company is a manufacturer or wholesaler dealing with jobbers or retail merchants." *Id.* (quoting *Haut v. Rossbach,* 128 N.J. Eq. 77, 15 A.2d 227 (N.J.Ch. 1940)).

The limited nature of *AYR's* holding, and its difference from the present facts, also is shown by the court's ruling on damages. The *AYR* court reversed the lower court's holding that the defendants were liable for the full amount of the debtor's liabilities, rather than for the value of the transferred assets. 619 A.2d at 598–99. The lower court was instructed to require plaintiff to meet its burden to demonstrate the value of the transferred assets, factoring out changes in value attributable to post-transfer actions or events. *Id.* Moreover, the court noted that

> the good will of the R/M agency, including its telephone number, general customer lists, employee base and the like may likewise have a value ascribed by suitable expert testimony. We reiterate, however, that the measure of damages is not the gross or net income from any particular account or accounts, but rather the sum of their fair market values as of the date of the transfer.

*Id.* (although it appeared that the former business had been transferred as a going concern, *see id.* at 594–95).

In contrast, SL was not a going concern when its employees moved to WL; it was at "death's door," it was unable to pay its rent, largest supplier, and other creditors, and it lacked unencumbered assets to pledge for new credit or the ability to provide adequate protection of HUB's cash and non-cash collateral.[21] Under such circumstances, it had no good will to transfer. *Kendall v. Sorani (In re Richmond Produce Co., Inc.),* 151 B.R. 1012, 1019 (Bankr.N.D.Cal.1993) (assets, such as good will, that are speculative and cannot separately be sold should be excluded from valuation), *aff'd* 195 B.R. 455 (N.D.Cal. 1996); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 111 (Bankr.S.D.N.Y.1999) (when a company is on its death bed, its assets should be valued according to what could be obtained at a liquidation sale, not pursuant to the normal going concern value approach); *Coated Sales, Inc. v. First Eastern Bank N.A. (In re Coated Sales, Inc.),* 144 B.R. 663, 672 (Bankr.S.D.N.Y.1992); 2–101 *Collier on Bankruptcy* ¶ 101.32[4] (15th ed.2008) (addressing whether and under what conditions good will constitutes an independent item to be included in the aggregate of the debtor's property: "The courts have quickly discounted fantastic claims of such assets and generally exhibited a great reluctance to accept good will as a separate asset, particularly where the enterprise was already in a seriously distressed condition."). *See also EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.),*

---

**21.** SL had been insolvent at least since the start of 1997.

380 B.R. 348 (Bankr.D.Del.2008), *aff'd* 400 B.R. 13 (D.Del.2009), where the bankruptcy court found that a transfer whose value was dependent upon the debtor's continued operation had no value because the debtor was not operating at the time of the transfer. *Id.* at 362–63.[22]

Having failed to establish that any of SL's assets were transferred for less than reasonably equivalent value (in fact, not having established any realizable value for the property that SL allegedly transferred to WL—with the exception of the inventory, which was transferred for fair value, and the accounts payable, for which WL is concededly liable on a simple contract theory), the Trustee has not carried his burden under sections 544 or 548 of the Bankruptcy Code.

■■■ B. *The Trustee's Breach of Fiduciary Duty Claims.* As a director and fifty percent shareholder of SL, Edelson was a fiduciary owing SL duties of care and loyalty. 2–12 *NJ Corporations and Other Business Entities* § 12.08[1] (Matthew Bender & Co.2007). Given SL's insolvency, such duties are enforceable under New Jersey law by the Trustee on behalf of the corporation and creditors. *VFB, LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir.2007); *Stanziale v. Dalmia (In re Allserve Systems Corp.)*, 379 B.R. 69, 78–79 (Bankr.D.N.J.2007); *AYR*, 619 A.2d at 598; *see also* 2–12 *NJ Corporations and Other Business Entities* § 12.08[3] ("If the corporation is insolvent, the action may be brought on behalf of the corporation by a receiver or trustee, or, if the receiver or trustee wrongfully fails to act, derivatively by a creditor. Shareholders will be benefited by a recovery in circumstances where the corporation's assets are greater than its liabilities. Creditors will be benefited if the assets are less than the liabilities.").

■■■ Absent fraud, self-dealing, or a disabling conflict of interest, Edelson's duty of care was subject to the "business judgment rule." *In re PSE & G Shareholder Litigation*, 173 N.J. 258, 801 A.2d 295, 306–07 (2002):

> The business judgment rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct.... The ... rule is a rebuttable presumption. It places an initial burden on the person who challenges a corporate decision to demonstrate the decision-maker's self-dealing or other disabling factor. If a challenger sustains that initial burden, then the presumption of the rule is rebutted, and the burden of proof shifts to the defendant or defendants to show that the transaction was, in fact, fair to the corporation.

(internal citations and quotations omitted); *see also Maul v. Kirkman*, 270 N.J.Super. 596, 637 A.2d 928, 937 (1994) ("So, bad judgment, without bad faith, does not ordinarily make directors individually liable."); 2–12 *NJ Corporations and Other Business Entities* § 12.08[5] ("In the absence of a conflict of interest, the presumption will not be overcome unless a plaintiff is able to show that the decision was made in an uninformed manner; that no one could reasonably believe the decision was in the best interests of the corporation; or that

---

**22.** In addition, as noted above, the Trustee has not sustained his burden to establish the value of the transfer even on a going concern basis, having failed to take into account the costs of preserving SL as a going concern and having extrapolated a going concern value from incomplete net sales data, not net profits, multiplied by an unsupported ratio. *See Geltzer v. Fur Warehouse, Ltd. (In re Furs by Albert & Marc Kaufman, Inc.)*, 2006 WL 3735621, **3–4, 2006 Bankr.LEXIS 3614, at *13–*15 (Bankr.S.D.N.Y. Dec. 14, 2006).

the decision was otherwise made in bad faith."). The rule applies to shield fiduciaries from liability for decisions that, even in retrospect, might be seen as clearly erroneous and damaging to their corporations, *including* decisions over whether to seek relief under the Bankruptcy Code. *Hedback v. Tenney (In re Security Asset Capital Corp.)*, 396 B.R. 35, 40 (Bankr. D.Minn.2008); *Official Comm. of Unsecured Creditors of RSL COM PRIMECALL, Inc. v. Beckoff (In re RSL COM PRIMECALL, Inc.)*, 2003 WL 22989669, **8–10, 2003 Bankr.LEXIS 1635, at *28–31 (Bankr.S.D.N.Y. Dec. 11, 2003); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 225 B.R. 646, 655 (Bankr. N.D.Ill.1998).

■ Here, the Trustee has suggested two ways in which Edelson breached his fiduciary duties: first, by causing SL to pledge its inventory and accounts receivable to HUB in return for forbearance and additional credit, rather than causing SL to seek chapter 11 relief; and, second, by causing SL's various challenged transfers to his wholly-owned corporation, WL. The first theory, however, does not involve alleged self-dealing or a conflict of interest separate and apart from the challenged transfers; and it does not appear that Edelson caused SL to stay out of chapter 11 because he wanted to effect and conceal such transfers (indeed, during the period that SL remained outside of bankruptcy, SL built up a substantial debt to WL). Nor was the decision uninformed, or patently not in SL's best interests, or otherwise in bad faith. Thus, Edelson's decision not to cause SL to seek bankruptcy relief is shielded by the business judgment rule.[23]

■ The challenged transfers, however, clearly involve a conflict of interest that triggers issues with respect to Edelson's duty of loyalty and overrides the business judgment rule. *VFB.*, 482 F.3d at 624, in which the court, applying New Jersey law observed, "[c]orporate directors must act in their shareholders' best interests and not enrich themselves at its expense. The law enforces this duty of loyalty by subjecting certain actions to unusual scrutiny. Where a director acts while under an incentive to disregard the corporation's interests, she must show her utmost good faith and the most scrupulous inherent fairness of the bargain." *Id.* at 633 (internal citations and quotations omitted). *See also AYR*, 619 A.2d at 595; 2–12 *NJ Corporations and Other Business Entities* § 12.08[6] ("A challenged transaction nonetheless may be upheld if the interested director is able to prove that the transaction was fair and reasonable to the corporation at the time it was entered into. The burden of fairness, however, will be on the director."). *See generally Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (transactions between controlling insider and corporation are subject to rigorous scrutiny to determine their fairness as arm's length bargains).

As discussed above, the Court has already found that the transfers to WL, and indirectly to Edelson, that could be at issue here are limited. That is, WL's post-petition acquisition of SL's inventory (nominally from HUB) clearly appears to have been for fair value; there was no protected customer list or other related information; SL's employees who went to work at WL were not bound to SL by any restrictive agreements, but, rather, they were em-

---

**23.** As noted above, moreover, it is hard to second guess SL's decision not to pursue a chapter 11 case over HUB's opposition, particularly when such a strategy would have to be premised on support from WL in the form of free rent and continued trade credit that WL was not required to provide.

ployees at will. Moreover, the quantifiable amount of "unfair discounts" (even, where, as here, the burden of showing fairness would be on Edelson) was, at best for the Trustee, no more than $25,000, an amount far less than the amount owed by SL to WL, and very clearly could have been in a much lower amount or even zero. The Trustee is left again, therefore, with the argument that Edelson caused WL to appropriate SL's "business." Does the fact that Edelson has the burden of showing the fairness of WL's relationship with SL in this regard change the result from the analysis of the same facts in the context of the Trustee's fraudulent transfer claims?

It does not. Edelson established that notwithstanding SL's deterioration and eventual collapse following the "alliance" (and WL's survival and improvement in sales), WL did not unfairly benefit from SL. Even accepting the Trustee's argument that WL obtained "SL customers," the Defendants established that WL did not make a profit on such orders. Moreover, the evidence showed that the parties managed the customer allocation aspect of their "alliance" fairly. The Trustee has not identified any other specific transactions in which Edelson had a conflict of interest with the exception of the eventual cessation of SL's business around the time of the involuntary chapter 7 petition and WL's picking up the pieces. It must be noted again, however, that at that time not only was SL clearly insolvent, but it also owed WL in excess of $564,000 and was temporarily occupying WL space rent-free because it lacked the resources to pay for its own space needs. It does not appear, therefore, that WL at that time improperly usurped any corporate opportunity of SL

that SL itself was financially able to undertake, since, through no material fault of Edelson, SL was unable to function as a going concern. *Seal–O–Matic Machine Mfg. Co. v. C. & M. Engineering & Mfg., Inc.*, 21 N.J.Super. 311, 91 A.2d 173 (1952); *see also Solimine v. Hollander*, 128 N.J. Eq. 228, 16 A.2d 203 (N.J.Ch.1940); Edward J. Trawinski, *Corporate Opportunty Doctrine*, 140 N.J. Law. 28, 29–35 (Jun.1991). As discussed above, moreover, the Trustee has not been able to show a meaningful measure of damages for such alleged usurpation, highlighting, ultimately, that there was nothing to usurp.

**C.** *The Setoff Issue.* The last issue raised by the parties[24] is whether, notwithstanding that WL did not timely file a proof of claim in this case, it may set off its undisputed $564,496.55 claim as an affirmative defense against the lesser amount, determined above, that it owes SL. (The Trustee's witness acknowledged that there was no basis for an asserted waiver of the right of setoff other than WL's failure to file a proof of claim. Tr.1, p. 150.) The clear majority and better view, however, is that filing a proof of claim is not a prerequisite to asserting an otherwise valid setoff. *See Davidovich v. Welton (In re Welton )*, 901 F.2d 1533, 1539 (10th Cir.1990); *Bernstein v. IDT Corp. (In re Frigitemp Corp.)*, 76 B.R. 275, 281 (S.D.N.Y.1987); *Neal v. Golden Knights, Inc. (In re Laughter, Inc.)*, 1995 Bankr.LEXIS 2163, at *10–16 (Bankr. E.D.Va. Oct. 13, 1995), *aff'd* 1996 U.S. Dist. LEXIS 15442 (E.D.Va. Apr. 8, 1996); *Fisher v. The Outlet Company (In re Denby Stores, Inc.)*, 86 B.R. 768, 777 n. 8 (Bankr.S.D.N.Y.1988); 5–553 *Collier on Bankruptcy* at ¶ 553.07[1] ("The prevailing

---

**24.** The Trustee's Proposed Findings of Fact and Conclusions of Law suggested that the postpetition sale of the Debtor's inventory violated the New Jersey Bulk Transfer Act; however, New Jersey repealed its Bulk Transfer Act effective January 10, 1995. N.J.S.A. § 12A:6–109 (2009).

view is that the failure to file a proof of claim does not prevent the creditor from asserting the right as a defensive matter, although the creditor may be barred from collecting a dividend with respect to the amount of the claim that exceeds the creditor's offsetting debt to the debtor."); *see also In re Bousa Inc.*, 2006 WL 2864964, **5–6, 2006 Bankr.LEXIS 2733, at *17–18 (Bankr.S.D.N.Y. Sept. 29, 2006). The Trustee relies upon *Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 465 (Bankr.S.D.N.Y. 2007), for the proposition that the failure to file a proof of claim constitutes a waiver of the claim, but it is clear from that decision's later discussion of the defendant's setoff rights that her failure to file a proof of claim would not have precluded a valid setoff right under Bankruptcy Code section 553. *Id.* at 465–66.

■ The Trustee also asserts, correctly, that a creditor's improper or inequitable conduct or, in rare circumstances, other goals and objectives of the Bankruptcy Code may preclude the exercise of a setoff right. *See Official Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re The Bennett Funding Group)*, 146 F.3d 136, 140–41 (2d Cir.1998); *Windsor Commc'ns Group, Inc. v. Havertown Printing Co. (In re Windsor Commc's Group, Inc.)*, 79 B.R. 210, 216–18 (E.D.Pa.1987). The Defendants have not engaged, however, in the kind of conduct that would preclude the right of setoff, and there is no other recognized reason for the Court to use its discretion to cut off such right.

### Conclusion

For the foregoing reasons, the Trustee's claims are denied with the exception of his claim against WL for unpaid accounts receivable in the amount of $133,866 and his claim for breach of fiduciary duty against Edelson based upon his claim that WL obtained unfair discounts from SL. The former claim is subject to a full setoff, however, against WL's undisputed claim against SL; the latter claim also may be satisfied by WL's full setoff of its undisputed claim against SL.

Counsel for the Defendants shall submit a proposed judgment in conformity with this Memorandum.